NARRAGANSETT REAL ESTATE COMPANY *vs.* JUDSON C. MACKENZIE, *et al.*

APRIL 12, 1912.

PRESENT: Johnson, Parkhurst, and Sweetland, JJ.

(1) *Trespass and Ejectment. Pleading.*

In an action of trespass and ejectment, where the possession of the premises is admitted by the defendant's pleas, it is unnecessary for plaintiff to prove it.

(2) *Waters. Riparian Rights. Tide Flowed Lands. Title.*

Pub. Laws, R. I. (1745–1752, p. 21), "An act for quieting Possessions and establishing Titles of Land, within the towns of Bristol, Tiverton, Little Compton, Warren and Cumberland," did not have the effect of bringing over into this State the Colonial Ordinance of 1641–1647 of the Massachusetts Bay Colony, giving the fee of tide flowed lands to the littoral

proprietor to low water mark, not exceeding 100 rods from high water mark.

(3) *Same.*

A plaintiff by proof of title to land bounding upon salt water in the town of Little Compton, has title in fee only to ordinary high water mark, and the fee to the land below ordinary high water mark is in the State.

(4) *Deeds. Construction. Waters. Wharves.*

A grant under an ancient deed, in consideration "that the inhabitants of the town of Little Compton having opened a highway of Two Rods wide," etc.,—"unto the sd. Town the following previledges (among others)—at Fishing place Cove–to Land Wood Lumber and any other Commodity— for exporting any Commodity from said Cove;—Also the previledge of building wharves in said Cove—"

*Held,* that the privilege of building wharves was granted to the inhabitants of the town and was not restricted to the town in its corporate capacity.

(5) *Deeds. Construction by Parties.*

Because of disputes as to the privileges granted under this deed, the then owner of the land entered into a rule of court, wherein the rights of the parties were submitted to referees, one of the questions submitted and the finding being as follows: "4. In what part or parts of said cove the said inhabitants have the right, if any, to build, erect, or maintain wharves?" "That a wharf or wharves may be built and maintained in any part or parts of said cove as above defined, at the pleasure *of said town.*"

*Held,* that the question was a construction by the parties in interest of the terms of the deed and the finding was that such wharves might be built and maintained by the *inhabitants.*

(6) *Trespass and Ejectment. Waters. Highways. Nuisances. Riparian Rights. Wharves. Town Council.*

An inhabitant of Little Compton petitioned the town council for leave to build a wharf within that portion of the cove granted to the inhabitants under the above ancient deed, specifying the location. This petition was granted. Subsequently the General Assembly authorized the petitioner to build a wharf in the cove, "from the road or way," subject to the approval of the town council. This approval was granted. The wharf and a building adjacent thereto were supported upon spiles below ordinary high water mark, the only connection with the upland being by means of planks, used for entrance from a public highway. The planks were made a part of the highway and were not in any way an obstruction to travelers. This highway existed of the authorized width of 33 feet, bounded on the east by a wall and on the west by the waters of the cove and at the wharf and building the distance between the wall on the east and the line of ordinary high water on the west was several feet less than 33 feet, so that if the highway had been constructed its full width it would have extended westerly beyond ordinary high water mark. In an action of trespass and ejectment to recover possession of the land bounded westerly by the cove, together with the wharf and building projecting westerly into said cove:

*Held*, that the wharf and building rested upon soil, the fee of which was in the State and the plank approach was a part of the public highway, which defendants in common with the public had a right to use, the approach offering no obstruction either to the public or the plaintiff in the use of any land owned by it.

*Held*, further, that the privilege being originally granted to the inhabitants of the town, the function of the town council in granting the license to build the wharf, was in exercise of its general powers to manage the affairs of the town, having the effect merely of determining the location and size of the wharf and giving permission to connect it with a highway, and was in no sense a conveyance of property requiring the vote of a financial town meeting. It was a regulation of the exercise of the right rather than a grant of a right.

*Held*, further, that while there was no evidence as to whom the building belonged, or under what claim of right defendant held it, and while it might be a purpresture and its connection with the highway unauthorized by the town council, it did not follow that plaintiff was entitled to possession, for if it were a purpresture it might be abated on behalf of the state or if its connection with the highway infringed the rights of the public that might be the subject of action by the town, but as plaintiff had failed to show that it was upon land to which he was entitled to possession, a verdict for plaintiff was not warranted.

Trespass and Ejectment. Heard on exceptions of both parties and exceptions of defendant sustained and exceptions of plaintiff overruled.

Parkhurst, J. This is an action of trespass and ejectment brought by the Narragansett Real Estate Company, a Rhode Island corporation, against Judson C. Mackenzie and William L. Winslow, both of Fall River, in the Commonwealth of Massachusetts, a copartnership doing business in said Fall River, and George Gray, of the town of Little Compton, in the State of Rhode Island. The premises for which this action is brought are described in the plaintiff's amended declaration and consist of a certain tract of land in the town of Little Compton, in the county of Newport, in this State, bounded westerly by Fishing Place Cove, together with a certain building and a wharf projecting westerly into said cove from said land.

The defendants' pleas consist of the general issue, and a great number of special pleas in which they admit their

possession of the wharf and building and lands covered thereby, but attempt to justify that possession in various ways, either by claiming that title is not in the plaintiff, but is in one through whom they claim, or by setting up a claim of right, alleged by them to be derived from several different sources, to the possession of the wharf and building and lands covered thereby and a right to occupy the same, all in derogation of the plaintiff's title and right to possession. The pleas being of this character, it became unnecessary for the plaintiff to prove at the trial of the case the possession by the defendants of the wharf and building as this was admitted by the pleadings.

While the case was pending, but before its trial, William L. Winslow, one of the defendants, died. His death was duly suggested on the record by the plaintiff, and the executrix of his estate was made a party defendant in the case by consent of the other parties and by order of the court, and an appearance was entered for her by the attorneys representing the other defendants.

The case was tried before a justice of the Superior Court and a jury at Newport on October 5th–10th, 1910, and at the conclusion of all the evidence in the case the court held that there was no question of fact for the jury to pass upon, and thereupon directed the jury to find for the plaintiff as to the building or storehouse and the premises occupied thereby, and to find for the defendants as to the wharf and the premises occupied by it. The jury thereupon found as directed.

Thereafter, within seven days, the plaintiff and the defendants filed their respective notices of intention to prosecute bills of exceptions to this court, and both the plaintiff and the defendants ordered copies of the testimony. The bills of exceptions and the transcripts of the testimony were duly filed and allowed and the case is now before this court on the plaintiff's and on the defendants' respective bills of exceptions.

As the questions upon which this case is to be determined are fundamental questions relating to the titles and rights of the respective parties in the premises in dispute in this action, it will not be necessary to refer in detail to the numerous exceptions alleged in the respective bills of exceptions.

The whole evidence in the case shows that, while the plaintiff showed title in itself to certain lots of land described in the declaration bounding westerly on the salt waters of Fishing Place Cove, from a certain portion of which the wharf and the building extend westerly over the salt water, it plainly appears that over these lots there extends from the northerly to the southerly side thereof a public highway two rods wide; that such public highway at the place where the wharf and building are located, covers all of the upland between an old stone wall on the east and mean high-water line on the west; that, in fact, if the highway were built to its full width of 33 feet, it would extend westerly beyond high-water mark, for a distance greater than that covered by the east frontage of the wharf and building; it also appears conclusively that the wharf and building are built upon spiles, and that the spiles are all driven into the soil below high-water mark, and that the only portions of the building and wharf which rest upon the upland are the approaches thereto which rest upon the soil of said public highway at or near the line of ordinary high-water mark.

The plaintiff contends in a most elaborate argument that its proof of title to the upland carries the fee to low-water mark, on the ground that the land, as originally granted, lay within the jurisdiction of the colony of Plymouth, and was acquired by the first settlers under grants from that colony, pursuant to the laws thereof; that the colony of Plymouth was united to the colony of Massachusetts Bay under the province charter of 1692 and that thereafter the lands now within the town of Little Compton (and other towns) were considered as under the juris-

diction of the province of the Massachusetts Bay and that the laws of the colony of Massachusetts Bay were extended and applied to all the lands formerly within the jurisdiction of the Plymouth colony; that among the laws then in force in the colony of Massachusetts Bay was one that originated in an ordinance passed in 1641 and amended in 1647, which had been followed by usage and been recognized and enforced by the courts as a part of the common law. The amendment of 1647 was as follows: "The which clearly to determine: It is declared, that in all creeks, coves and other places about and upon salt water, where the sea ebbs and flows, the proprietor of the land adjoining shall have propriety to the low water mark, where the sea doth not ebb above a hundred rods, and not more wheresoever it ebbs further: provided that such proprietor shall not by this liberty have power to stop or hinder the passage of boats or other vessels, in or through any sea, creeks or coves, to other men's houses or lands." (See Mass. Colonial Laws, 1672, rep. 1887, p. 90–91.) And plaintiff's counsel cites numerous authorities from Massachusetts to show that the above quoted ordinance was regarded as a part of the common law of that state regarding littoral ownership and was extended to cover all the lands formerly included within the bounds of Plymouth colony, as well as other lands under the jurisdiction of the province of the Massachusetts Bay, *Austin* v. *Carter*, 1 Mass. 231; *Com.* v. *Alger*, 7 Cush. 70; *Porter* v. *Sullivan*, 7 Gray, 443; *Boston* v. *Lecraw*, 17 How. 432; *Com.* v. *Roxbury*, 9 Gray, 451; *Codman* v. *Winslow*, 10 Mass. 146; *Barker* v. *Bates*, 13 Pick. 255; *Mayhew* v. *Norton*, 17 Pick. 357; *Lapish* v. *Bangor Bank*, 8 Greenl. 85. But it is not to be forgotten that for a long term of years, beginning shortly after the grant of the king to the colony of Rhode Island of the charter of 1663, claim was made by this colony that the lands lying easterly from the waters of Narragansett Bay and now included within the towns of Little Compton, Tiverton, Bristol, Barrington, Warren and Cumberland were

within the grant made by the king to this colony, and that the claim of jurisdiction thereof by Plymouth colony and by the province of the Massachusetts Bay should be set aside in favor of the colony of Rhode Island; and proceedings were had and continued for many years before the Privy Council in England and upon appeal to the King in council, beginning at least as early as 1734, until finally, an order in council, dated May 28, 1746, was issued, confirming by royal decree the decision of commissioners formerly made awarding the disputed territory to Rhode Island. (For a history of this controversy and of the final results thereof see Vol. II. Acts of the Privy Council, Colonial Series &c., published 1910.) The decision of this long standing dispute in favor of the colony of Rhode Island was a recognition of the rightfulness of Rhode Island's claim from the outset; and it became necessary, in view of the fact that these lands had been settled and occupied under grants made or authorized by the General Assemblies of the colonies of New Plymouth, or of Massachusetts Bay or of the province of the Massachusetts Bay, to pass an act for quieting possessions and establishing titles; accordingly such an act was passed by the General Assembly of the colony of Rhode Island (See Pub. Laws, R. I., 1745–1752, p. 21), as follows: "An Act for quieting possessions, and establishing Titles of Land, within the Towns of Bristol, Tiverton, Little Compton, Warren, and Cumberland." "Whereas agreeable to His Majesty's Royal Determination, there is lately taken into the Jurisdiction of this Colony, a considerable Quantity of Land, and a large Number of Inhabitants, of which the above-mentioned Towns consist, which have been long under the Jurisdiction, Laws and Constitutions, of the Province of the Massachusetts Bay; And the Titles of their Land, and manner of distributing Intestate Estates, are very different from the Laws and Customs of this Colony; so that great Injustice, Confusion, and Misery, must happen

to those Inhabitants, if timely Care be not taken to prevent the same.

## "FOR REMEDY WHEREOF

"Be it enacted by the General Assembly of this Colony, and by the Authority of the same, It is enacted, That all Grants and Conveyances of Lands heretofore made by the General Assemblies of the late Colony of New–Plymouth, the late Colony of the Massachusetts, or by the Province of the Massachusetts-Bay, or by any Commissioners, Agents, or Persons by them, or any of them, duly appointed and authorized, or by any other Authority derived from them, or any of them, lying within any of the Towns aforesaid, shall be as good, valid, and effectual, to all Intents and Purposes whatsoever, to the Grantees, their Heirs or Assigns, as if the Lands so granted, had really been situated in the Colony or Province, by whom, or by whose Authority the same were made, and shall forever hereafter be so adjudged and construed, in all Courts of Judicature in this Colony.

"And be it further Enacted by the Authority aforesaid, That all Estates, both Real and Personal, left by Persons who have died Intestate, before the Publication of this Act, and which lie, or are within the Bounds of the aforesaid Towns, shall be distributed and settled among the Children, or legal Representatives of such Intestate, agreeable to the Laws of the Province of the Massachusetts–Bay, in Force at the Time of such Intestates Death, which laws shall have the same Force and Effect in this Colony, in the Tryal of, and settling and distributing such Intestates Estates, as if the same were Laws of this Colony duly made, and shall be so adjudged, construed, and understood by all Judges, and Ministers of Justice in this Colony: And that the several Town–Councils of the above–mentioned Towns, be, and they are hereby fully impowered and required to compleat the Distribution and Settlement of such Intestates Estates as aforesaid, which yet remain

unsettled, in the same manner, and as fully and effectually, in all Respects, as the same could have been by the Courts of Probate, had the said Towns still remain'd within the Province of the Massachusetts-Bay.

" And be it further Enacted by the Authority aforesaid, That all Grants, Deeds, Conveyances and Land Evidences whatsoever, that have heretofore been made of any Lands, within any of the aforesaid Towns, and which were executed and registered according to the Laws in Force there, at the Time of making the same, shall be adjudged and deemed as good, valid, and effectual, to all Intents and Purposes whatsoever, as if the same had been made, executed and recorded within, and according to the Laws of this Colony; And Copies of all such Grants, Deeds, Conveyances and Land Evidences, produced from, and attested by such offices and officers, where the same are registered shall be received as lawful Evidence, by all Courts in this Colony." See, also, Laws R. I. 1798, p. 469, Jan. 27. 1746.

The plaintiff earnestly contends that the effect of this act was to bring over into Rhode Island the colonial ordinance of 1641–1647 of the Massachusetts Bay colony, giving the fee of tide-flowed lands to the littoral proprietor to low-water mark, not exceeding 100 rods from high-water mark, and to make it applicable as a rule of property to all lands in the town of Little Compton (and other towns included in the act), because such had been recognized as the rule of law in the colony of Massachusetts Bay, and of New Plymouth. We are unable to agree with this contention, for the reason, first, that the colonial ordinance of 1641–1647 was an ordinance of the Massachusetts Bay colony, and the lands in Little Compton were claimed to be under the jurisdiction of New Plymouth colony; second, that there is nothing to show that said ordinance was ever adopted or recognized in New Plymouth, or that it ever became in force as to the lands rightfully under the jurisdiction of New Plymouth, so long as that colony existed as a separate organization, or in fact that it was ever re-

garded as a rule of property in that portion of the province of the Massachusetts Bay, until long after the lands claimed by the colony of Rhode Island had been decreed to belong to the said colony. There is nothing in the act above quoted to indicate that our Colonial General Assembly had in mind any such rule of property or any intention of adopting the same, and it is manifest from a careful reading of the whole act that its purport and intent were to quiet possessions and establish titles against all claims or questions that might arise from the change of jurisdiction (sub. 1) and particularly which might arise as to the distribution of intestate estates (sub. 2), and as to proofs of title by record (3) evidence (sub. 3). Our conclusion upon this branch of the case is, therefore, that the plaintiff, by its proof of title to the land bounding upon salt-water, has title in fee only to ordinary high-water mark, and that the fee of the land below ordinary high-water mark is in the State, as has always been the rule in this State, under our decisions. See *Engs* v. *Peckham*, 11 R. I. 210; *Aborn* v. *Smith*, 12 R. I. 370, 373; *Gerhard* v. *Bridge Commr's.*, 15 R. I. 334; *Allen* v. *Allen*, 19 R. I. 114, 115; *N. Y., N. H. & H. R. R. Co.* v. *Horgan*, 25 R. I. 408; *City of Providence* v. *Comstock,* 27 R. I. 537, 544.

The defendants claim that they have the right to occupy the wharf by virtue of the following facts: It appears that William Rotch, being one of the ancestors in title of the plaintiff, and being then the owner and in possession of the farm at Seaconnet, which included Fishing Place Cove within its boundaries, by his deed bearing date Nov. 11, 1796, granted certain privileges to the inhabitants of Little Compton, including the right to build wharves in Fishing Place Cove: the deed is as follows:

(4)  "Know all Men by these presents, that I, William Rotch of New Bedford in the County of Bristol & State of Massachusetts, for and in Consideration that the Inhabitants of the Town of Little Compton in the State of Rhode Island having opened a highway of Two Rods

wide from the main rode Leading into the neck and continuing as far as the North side of the Point Farm belonging to sd William Rotch and provided the said Town shall fence it at their own Expense, and keep the said Road open . . . I the said William Rotch do grant unto the sd Town the following previledges—Viz . . . a previledge at the Fishing place Cove exclusive of a Two Rod Road to the Cove, to Cart up Seaweed, and leave the same on the Beach to be carted away when most convenient. . . . Likewise to Land Wood, Lumber and any other Commodity whatever in the same manner . . . also an equal previledge for exporting any Commodity whatever in the same manner from said Cove . . . Also the previledge of building wharves in said Cove . . . Likewise the previledge of a driftway from said Fishing place Cove to the point on the upland adjoining the shore . . . And likewise a lot of half an acre of clear upland exclusive of Rocks, to be fences and the fence maintained by the Proprietor of said Farm, said land to be to the Notherd and Eastward of the high Rocks, and to be used for Graising only . . . Likewise a previledge for any of the Inhabitants of said Town, or other persons to Land in Boats on the Point, and to haul up their Boats on the Beach and to keep them there at their own pleasure, and for any of the Inhabitants of sd Town to Cart sand from the Beach on the Point. . . . But it is Considered that all the previledge of Manure or seaweed is reserved to the proprietor of said Farm, except what may be at the afore sd Fishing Place Cove, and that no previledge is given for any House Store or other building to be erected on the premises either at the said Cove or on the Point without liberty hereafter granted by the Proprietor of said Farm . . . And I hereby bind myself, my heirs & assigns to the continuance of the aforementioned previledges so long as the Inhabitants of the aforesaid Town of Little Compton shall at their own Expence keep the said Road open . . .

"In Testamony whereof I have hereunto set my hand and affixed my seale this Eleventh day of the Eleventh month One Thousand seven hundred and Ninety Six.
. . . "

In construing the broad and general provisions of this deed as a whole it is manifest that it was the grantor's intention to give the privilege of building wharves in the most ample manner in aid of the other provisions permitting the landing of wood, lumber and any other commodity whatever and the exporting of any commodity whatever; and it must have been the grantor's intention that inhabitants of the town should exercise the privilege of building wharves, because it is inconceivable that such privileges should have been intended to be confined to the town in its corporate capacity. It would be a strained and narrow construction of this deed to hold that such general privileges of import and export, so manifestly convenient and necessary to the inhabitants, were intended to be exercised by the town alone, or that the privilege of building wharves in aid of such general privileges could only be exercised by the town as such. This court is of the opinion therefore that the grant of the privilege of building wharves was intended to be exercised by individuals, inhabitants of the town.

The record of evidence does not disclose whether this privilege of building wharves was, for many years after the date of this deed, exercised by the inhabitants, but it does disclose that many disputes arose between the subsequent owners of the land and the town as to the extent of the privileges which might be exercised by the town and its inhabitants under the terms of this deed, until finally it appears that in 1868, when said farm had become the property of David Sisson and wife, ancestors in title of the plaintiff, such disputes and suits had arisen between Sisson and wife and the town, that the parties entered into a rule of court in the Court of Common Pleas for Newport County, wherein the respective rights of the parties were

submitted to referees, whose report thereon, dated Nov. 18, 1868, and afterwards duly confirmed and judgment entered thereon, was as follows:

"REPORT.

"NEWPORT, SC.

"*To the Honorable Court of Common Pleas.*

"In the Matter of the Rule

"Between David Sisson and Wife

and

"The Town of Little Compton.

"The undersigned appointed Referees in said case by the agreement of the parties and the Commission of the Honorable Court hereto annexed

"Respectfully Report:

"That having been first duly engaged upon their said commission as appears by the Magistrates Certificate endorsed thereon they notified and met the said parties and their respective counsel who then and there submitted for arbitration the following questions and matters as in dispute between them viz.:

"*First.* What, if any, way, or right of way exists to Fishing Place Cove so called from the West end of the open highway leading from Bailey's Corner to the North line of said Sissons farm, and what if any, gates bars or other obstructions said Sisson and wife as the owners of said farm have the right to maintain upon the same?

"*Second.* The extent and limits of said Fishing Place Cove.

"*Third.* The extent of the Beach of said Cove upon which the Inhabitants of said Town have the right, if any, to haul up and bank or pile seaweed?

"*Fourth.* In what part or parts of said Cove the said Inhabitants have the right if any to build, erect or maintain a wharf or wharves?

"*Fifth.* What if any, way or right of way exists from said Fishing Place Cove along the upland next the shore

to the Horse Pasture so called and to Seaconnet Point. And if any such way or right of way exists, the relative rights and obligations of the parties respecting the same, especially with reference to the washing or wearing away of the same by the action of the sea.

"*Sixth.* What if any right exists to take sand from the shore or beach at or near Seaconnet Point?

"*Seventh.* What if any damages said Sisson and wife are entitled to recover for the removal heretofore of portions of their walls on or adjoining said ways as shown in evidence before referees?

"And after hearing and considering the respective allegations, evidence and arguments of said parties and their counsel upon the said several questions and matters submitted, we do determine and award as follows:

"*First.* That there exists a town way two rods wide through the farm of said Sisson and wife to said Fishing Place Cove from the West end of said open highway leading from Bailey's corner to said farm; and that the course of said town way through said farm is as marked out and defined upon the plat herewith returned and made a part of this report; And that said Town way is at all times to be left and kept open and unobstructed except that said Sisson and Wife their heirs or assigns, owners of said farm may keep and maintain suitable and convenient gates across the same, one at the East end thereof where the same opens at the line of said farm into said highway leading from Bailey's Corner and one at or near West end thereof where the same meets the wall of said farm next to said Fishing Place Cove as marked on said Plat.

"*Second.* That the limits of said Fishing Place Cove are defined by a straight line drawn across the mouth thereof from the most northerly point of the rocks upon the shore of Bluff Head so called (exclusive of the Breakwater) to the Westerly end of the South wall of the Six Acre lot so called on said Sisson's farm and as said line is drawn upon said plat in red ink and marked A B.

"*Third.* That the beach of said Cove upon which the Inhabitants of said Town have the right to haul up and bank or pile seaweed to be carted away at their pleasure is that portion of the shore of said Cove lying between ordinary high water mark and the turf land bordering said Cove and shifting as the same may from time to time shift or change from the action of the sea or other natural causes.

"*Fourth.* That a wharf or wharves may be built and maintained in any part or parts of said cove as above defined, at the pleasure of said Town.

"*Fifth.* That a driftway exists from the South Westerly part or corner of said Fishing Place Cove along the upland next the shore to said Horse Pasture and to Seaconnet Point—And the said Town of Little Compton shall at all times keep the surface bed of said driftway in ordinary and suitable repair as a driftway as against all injuries except those which arise from the action of the sea, destroying said roadbed or so impairing it as to render it unfit for use or travel. And if, whenever, and as often as, the said driftway shall be destroyed or impaired in any part so as to render it unfit for use or travel by the action of the sea the said Sisson and wife their heirs or assigns owners of said farm or the adjoining portions thereof, shall, as soon as may be either rebuild or repair the same, or shall throw out and leave open and unobstructed (setting back their shore wall if need be for this purpose) adjoining upland. So as at all times to leave an open driftway along the upland next the shore at least ten feet wide between their said shore wall and the edge of the shore bank.

"That the Inhabitants of said Town have the right at all times and for any and all purposes to take and cart away sand from the shore adjoining said Seaconnet Point at Pleasure.

"*Seventh.* That the said Sisson and wife are not entitled to recover any damages for any removal heretofore of any portions of their walls on or adjoining either of said ways."

(5)  It therefore appears that the fourth question submitted in the above reference, "In what part or parts of said Cove *the said inhabitants* have the right, if any, to build or maintain a wharf or wharves?" was a construction by the parties in interest, of the terms of the Rotch deed, and that the finding of referees in response thereto "that a wharf or wharves may be built and maintained in any part or parts of said cove as above described at the pleasure of said town," was a finding that such wharf or wharves might be built and maintained by "the inhabitants;" which is fully in accord with the construction given by this court, upon consideration of all the terms of the deed as above set forth.

(6)  It further appears in and by said report and plat filed therewith (Deft's Ex. 15) as well as by the Rotch deed and the proceedings of town meetings held after the date of said deed, that there had existed for many years a two rod road leading through the farm from the west end of the open highway to the Fishing Place Cove; the right to the use of this two rod road by the town was determined by the said report. Subsequently, by deed dated January 19, 1888, Henry T. Sisson and wife conveyed to the town of Little Compton a certain strip of land for highway purposes, thirty-three feet wide, "beginning at the west end of the road running from the Mansion House of the grantors, west to Fishing Place Cove (so-called), and running southerly, being thirty-three feet in width, along the line of a proposed street as delineated upon a plat surveyed by Clifton A. Hall," &c.; said deed was accepted by the town council March 26, 1888, and the road was laid out and used thereunder ever since as a public highway; and it further appears that that portion of said highway with which the easterly end of the wharf and the easterly side of said building are connected is practically in the same location as the old road which was in existence and in use as a public highway as above set forth prior to the date of said last mentioned deed, being bounded upon the east by an old stone wall, and upon the west by the salt water of Fishing

Place Cove; and it appears by the evidence that at the place mentioned, viz.: at the wharf and building, the distance between the old stone wall on the east and the line of ordinary high-water on the west, is several feet less than the width of thirty-three feet, so that if the highway were constructed at that place of the full width of thirty-three feet it would extend westerly beyond ordinary high-water mark. It further appears that in order to protect the highway from the action of the water, a sea-wall was erected some years ago, along the westerly side of said highway as actually constructed from the southerly side of said wharf for upwards of one hundred and fifty feet; and that the distance between said old wall on the easterly side of said highway and the line of said sea-wall at the location of the wharf and building is less than thirty feet.

It further appears that on February 8, 1902, James H. Shaw, an inhabitant and citizen of Little Compton, petitioned the town council of Little Compton for leave "to build, equip and maintain a wharf or pier on the east side of Church's Cove near Sakonnet Point in said town within that portion of the cove granted to the inhabitants of the town by deed from William Rotch, dated November 11th, 1796," . . . and to locate the same "about two hundred feet southerly from the Northerly side of the road or way, as it runs Westerly, leading to Fishing Place Cove." This petition was granted by the town council, February 10, 1902. Subsequently on the 12th day of March, 1902, a resolution of the General Assembly was passed, whereby said Shaw and his assigns were licensed "to build and maintain a wharf or pier in Little Compton, in tide-water, not exceeding four hundred feet in length from high-water mark, and fifty feet in width, which wharf or pier shall extend from the road or way, as it runs southerly, leading to Fishing Place Cove, on the easterly side of Church's Cove, near Seaconnet Point; Provided, that this license and privilege shall be approved by the town council of the Town of Little Compton." As the town council had already

granted this privilege to said Shaw, the approval of the town council provided for in the above resolution was purely a formality, and could have been treated as already given; but after the issue of the writ in this case, and before actual service of the writ, the town council did on the 8th day of February, 1909, pass a resolution approving the license and privilege granted to said James H. Shaw and his assigns by said resolution of the General Assembly.

It appears from a careful review of all the evidence that the wharf and the building known as the storehouse adjacent thereto are both supported upon spiles driven into the soil below ordinary high-water mark, the fee of which is in the State; and that the only connection of the wharf, and the building with the upland, is by means of planks used for purpose of entrance thereto from the public highway above described. These planks are made a part of the public highway and are not shown to be in any way an obstruction therein to the traveler thereon. The license given to Shaw and his assigns by resolution of the General Assembly was to build the wharf *"from the road or way,"* and this is what he has done.

It has been held that a wharf built from a public highway into navigable waters is an extension of a public highway (*The Empire State, Newb. Adm. Rep. 541*); and that where a private dock is built over a public street upon the shore of navigable waters, the dock becomes a part of the street and the public has a right to travel over it. (*City of Buffalo* v. *D. L. & W. R. R. Co.* 190 N. Y. 84.)

We find therefore upon all the evidence in the case that the wharf and building rest upon soil flowed by the tide below high-water mark, and the fee of such soil is in the State; that the plank approach to such wharf and building as a means of ingress thereto and egress therefrom is a part of the public highway, which the defendants in common with the public have a right to use, and that so far as the evidence shows such plank approach is no obstruction either to the public or to the plaintiff in its

use of any of the land owned by it. In our opinion the grant of the petition for leave to build and maintain the wharf to James H. Shaw, an inhabitant of the town, was properly made by the town council. As we have already decided, the privilege was originally granted to the "inhabitants," by the Rotch deed; the function of the town council, in its resolution giving the permission to build and maintain the wharf, was that ordinarily exercised by such a body, in granting a license, under its general powers to manage the affairs and interests of the town. Gen. Laws, 1909, Chapter 50, Section 4, provides: "The Town Council of each town shall have full power to manage the affairs and interests of each Town and to determine all such matters and things as shall, by law, come within their jurisdiction." It is merely, in effect, a license, which determines the location of the wharf, and its size, and gives permission to connect it with a public highway; it is not in any sense a conveyance of property, such as would require the vote of a financial town meeting; in fact, as we have seen, the right or privilege of erecting and maintaining the wharf was given by the deed to "the inhabitants;" so that the license of the town council is, in effect, merely a regulation of the exercise of the right, rather than the grant of a right.

With regard to the building, there is no testimony to show by whom, when or under what circumstances the same was built, or to whom it belongs, and it is not clear under what tenancy or right or claim of right the defendant Gray holds the same; it appears that he pays rent to the "Shore Transportation Co.," but it nowhere appears in evidence what that company is or whether it has any connection with the other defendants who occupy the wharf. For all that appears in evidence, the building may be an entirely unauthorized structure, resting upon spiles driven into the soil, under tide-water, the fee of which is in the State and it may be a purpresture. Its connection with the soil of the public highway may be, so far as appears, entirely unauthorized by any act of the town council. But it does

not follow from this that the plaintiff is entitled to possession of it; if it is a public nuisance or purpresture, it may be abated, by proper proceedings on behalf of the State, upon whose soil it rests; if its connection with a public highway infringes the rights of the public therein (which does not appear), such connection or the cessation thereof may, perhaps, be the subject of action on the part of the town. But inasmuch as the plaintiff has failed to show that said building rests upon land to which it is entitled to possession, we are unable to agree, with the finding of the Superior Court, in its direction of a verdict for the plaintiff as to the building and the soil upon which it rests. Among all the vast number of cases cited by the parties, we find only one case, where a suit for trespass and ejectment has been sought to be maintained with reference to a structure built upon the soil covered by tide-water; in the case of *Coburn* v. *Ames,* 52 Cal. 385, where the owner of the upland sought to recover in an action of trespass and ejectment a wharf which was connected with the upland at a point where a public highway was supposed to have been laid out, but where as a matter of fact the layout was held to be invalid, the court refused to enter judgment in ejectment for that portion of the wharf which was below high-water mark. The court says (p. 396): "The plaintiff, however, contends that, being a riparian owner, he was entitled to wharf out to deep water in front of his land; and as incidental thereto that he has such a right to the possession below low-water mark as will maintain ejectment. We find it unnecessary to decide in the present case to what extent, if at all, and under what conditions, if any, a riparian owner is entitled, at common law, to wharf out to deep water; nor do we deem it material to determine whether Ames & Templeton acquired a valid right to construct the wharf and chute, in virtue of the proceedings before the Board of Supervisors. For our present purpose, we shall assume that the proceedings were null and void, and conferred no right to construct the wharf and chute, and shall further assume that the plaintiff, as a riparian owner, is entitled

to wharf out to deep water. This brings us to the question whether, on these assumptions, the plaintiff has such a right to the possession of the land below low-water mark as will enable him to maintain ejectment.

"We have been referred to no authority which supports the affirmative of this proposition, nor can it be maintained on principle. It is well settled in England that the *title* in the bed of the ocean is in the sovereign, subject to the *jus publicum*—the right of navigation and fishery—of which the public cannot be deprived. In this country, where the people are sovereign, the *title* to the bed of the ocean is in the State, which represents the sovereign power; and if obstructions are erected which materially impair the public right of navigation and fishery, they may be abated as public nuisances. But all encroachments on navigable tide-waters are not necessarily public nuisances. They may be of such a nature as not to obstruct the public right of navigation and fishery; and in that event the encroachment is what the law terms a *purpresture*—an unlawful intrusion upon the bed of the ocean, the *title* to which is in the sovereign. In such cases, it is for the sovereign authority to decide whether the public good requires that the obstruction be removed. In *People v. Davidson*, 30 Cal. 389, Mr. Justice Shafter, speaking for the court, said: 'If the soil in this case belongs to the State—and such is the theory of the bill—then the wharf, if erected, will belong to it also. The defendants will be unable to collect wharfage, and will have no rights except those belonging to the public at large. Possession of the land and wharf, should it be withheld, *can be recovered in ejectment,* and thereafter the wharf can be managed by the State, according to its own views of public good.'

"It seems clear from this authority, and on principle as well, that in a case where no question of riparian rights intervenes, the State may maintain ejectment for a wharf constructed without authority of law, in navigable tidewater below the line of low water. If there be, however, a riparian owner, in front of whose land the wharf is erected,

(as in this case) the question arises whether the right of action for the possession is in him or in the State. It cannot be in both at the same time. Assuming as we do, for the purposes of this decision, that the riparian owner is entitled to wharf out to deep water, it is clear, we think, that this right is in the nature of a franchise or privilege, to be exercised or not by him at his election. He may never see fit to avail himself of the privilege; and it cannot be pretended that while declining to avail himself of his right to wharf out, he is, nevertheless, entitled to the possession of the land below high-water mark, on the theory that at some future time he may possibly change his mind and desire to erect a wharf. On this theory he might capriciously refuse to erect a wharf at a point where the convenience of commerce demands it, and might prevent others indefinitely from engaging in the enterprise. A theory which works this result cannot and ought not to be upheld. On the contrary, giving to this right of the riparian owner its widest scope and latitude, it amounts only to this: that if he desires to wharf out, and is unlawfully obstructed in the exercise of the right, he may maintain an action for damages; and if the obstruction amounts to a public nuisance, it may be abated by appropriate proceedings for that purpose. If it be only a private nuisance which obstruct him in the exercise of his right to wharf out, he may possibly cause it to be abated by the appropriate method. But he has no such title or right to the possession of the bed of the ocean as will enable him to maintain ejectment. In this State, there are numerous large landed estates, held in private ownership, which front for many miles on the shore of the ocean, and on navigable bays and inlets within the ebb and flow of the tide; and if the doctrine were tolerated that each of these proprietors, while himself declining to erect and maintain the docks, piers, and wharves which are necessary for the convenience of commerce, nevertheless, in virtue merely of his riparian rights, might maintain ejectments for all such structures erected by others, which, when recovered, he might either demolish

or cease to use in aid of commerce, it is not difficult to foresee the disastrous consequences which would result from such a doctrine. It results from these views that the Court below erred in including in the judgment for the plaintiff the wharf and chute below high-water mark."

In *Gerhard* v. *Bridge Commr's*, 15 R. I. 334, where claimants of tide-flowed flats on the east bank of the Seekonk river sought compensation for the obstruction and occupation of such flats by the pier of a bridge, the court refused such compensation on the ground that the title was in the State, saying: "This court has decided that the title to the soil under tide-water is in the State, and that even the establishment of a harbor line does not transfer the fee to the riparian owner, but only operates as a license to him to fill out and incorporate the flats with the upland. We do not think, therefore, that Gerhard and wife can be held to have acquired under their lease any interest as against the State in the flats occupied by the bridge, and consequently we think that they are not entitled to compensation, the bridge having been built by authority of the State." If the parties could not recover compensation for the taking or obstruction of tide-flowed flats, it is impossible that they should be able to maintain trespass and ejectment to recover possession of them.

In view of the plain principle underlying the last cited cases, we are of the opinion that the plaintiff has shown no right to maintain its action in this case against any or either of the defendants. The exception of the defendant to the direction of a verdict for the plaintiff as to the building and the land occupied thereby is therefore sustained; the exception of the plaintiff to the direction of a verdict for the defendant as to the wharf and land occupied thereby is overruled, and the case is remitted to the Superior Court for the county of Newport, with direction to enter judgment for the defendants.

*Gardner, Pirce and Thornley*, for plaintiff.
*William W. Moss, Hugh B. Baker*, of counsel.
*Sheffield, Levy and Harvey*, for defendants.