ARMOUR & COMPANY *vs.* CITY OF NEWPORT.

JULY 9, 1920.

PRESENT:   Sweetland, C. J., Vincent, Stearns, and Rathbun, JJ.

*(1)   Colonial Grants.   Public Easements.*

The vote of 1739 of the freemen of the town of Newport acting under authority of an act of the Colonial General Assembly at the May session, 1707, operated as a grant by the town of certain land on Long Wharf to the grantees in fee, reserving an easement for the use of the whole people of the colony in a strip of land thirty feet wide on the south side.

*(2)   Public Grants.   Construction.*

A public grant of land to private parties for wharf purposes is to be construed most favorably to the grantor.

*(3)   Public Grants.   Adverse User.*

No right by adverse user can be acquired in a public easement.

*(4)   Public Grants.   Taxing of public Eastment to Individual.*

No right can be acquired in a public easement by the payment of taxes on the land by an individual and the public lose no rights by the unauthorized act of assessors of taxes in assessing taxes on the land.

BILL IN EQUITY.   Heard on certification under Gen. Laws, cap. 289, § 35.

RATHBUN, J. This is a bill in equity praying that the respondent be permanently enjoined from removing a structure erected by the complainant on a parcel of land in the city of Newport, located on Long Wharf.

The bill alleges that the complainant is the owner in fee of said parcel of land which is described in the bill as follows: "Northerly, on Long Wharf, seventy-two (72) feet; Easterly, on land of William S. Rogers, thirteen and five-tenths (13.5) feet; Southerly, on the salt water or Newport Harbor, seventy-two (72) feet; and Westerly, on land now or formerly of James T. O'Connell, twelve and one-tenth (12.1) feet: for a more particular description of which, reference is hereby made to a plat thereof, attached hereto and marked Exhibit 'A'."

The bill further alleges that for more than fifty years, for more than twenty years and for more than ten years last

past the complainant and its ancestors in title, by themselves and by their agents, servants and employees, have been in the exclusive, quiet, peaceable and uninterrupted possession of said land; that the Board of Aldermen of said city took proceedings to declare certain land on said Long Wharf a public highway but that the land in question constitutes no part of the land declared to be a public highway; and that the complainant has erected a structure on said described land and has the lawful right to maintain the same and that the city of Newport through its police authorities has threatened to remove said structure and to disturb the possession of the complainant.

The answer denies the ownership of the complainant, admits the proceedings before the Board of Aldermen and also admits that respondent has threatened to remove said structure. The answer denies the other allegations in the bill and alleges that the land in question is a part of a strip of land, about thirty-five feet in width, on Long Wharf declared by the Board of Aldermen to be a public highway; that at the time said proceedings were taken by the Board of Aldermen the respondent was, and for many years prior thereto had been, in quiet and peaceful possession of the land in question and that the respondent is the owner of said land and in possession thereof.

The following issues of fact were framed: 1. Is the complainant the owner of the strip of land described in the first paragraph of the bill of complaint? 2. Did the respondent under the proceedings mentioned in the third, fourth and fifth paragraphs of said bill of complaint or otherwise legally acquire any right in said land as set forth in its answer?

Testimony was taken before a master and after hearing for final decree the cause was certified to this court, in accordance with the provisions of Section 35, Chapter 289, General Laws, 1909.

It becomes necessary, in order to determine the questions presented, to consider an act passed in the year 1707 by the

Colonial General Assembly granting certain authority to the several towns over "coves, creeks, rivers, waters (and) banks bordering upon their respective townships"; and also to consider a vote of the freemen of the town of Newport passed in the year 1739.

During the time that Rhode Island was a colony of Great Britain the fee to land within the colony below highwater mark was in the Crown. Under our form of government sovereignty resides in the people and when the colony became independent the fee to such lands passed to the State, which represents the sovereign power, and the General Assembly succeeded to the rights of King and Parliament to control or alienate land below highwater mark. *Bailey* v. *Burges*, 11 R. I. 330; *Clark* v. *City of Providence*, 16 R. I. 337; *Murphy* v. *Bullock*, 20 R. I. 35; *N. Y., N. H. & H. R. R. Co.* v. *Horgan*, 25 R. I. 408; *Narragansett Real Estate Co.* v. *MacKenzie*, 34 R. I. 103. But from the earliest settlement the people have had certain rights in the public waters including land below highwater mark. The Colonial General Assembly, at the May Session 1707, passed an act as follows: "Be it enacted by the Honorable Governor and council and house of representatives convened in General Assembly and by the authority of the same it is enacted, that each town in this colony now established, or that may hereafter be established, may be, and have hereby granted unto them full power and authority to settle such coves, creeks, rivers, waters, banks bordering upon their respective townships, as they shall think fit for the promotion of their several towns and townships, by building houses, and warehouses, wharfs, laying out lots, or any other improvements, &c., as the body of freeholders and freemen of each town shall see cause for, or the major part of them, for their most benefit, not prejudicing any particular person in their proper original grants or purchases upon any the aforesaid harbors, coves, creeks, &c., which we doubt not but will much promote the interest of Her Majesty, and the good of her good subjects in said colony, for the promoting of trade and navigation." IV R. I. Col. Rec. 24.

In 1739 the freemen of the town of Newport, acting under the authority of the above act, passed the following vote at a quarterly meeting: "At a Quarterly Meeting of the Freeman of the Town of Newport in the Colony of Rhode Island &c met the first Wednesday of Oct A D 1739 WHEREAS Henry Collins, Samuel Rodman, Henry Bull, Clarke Rodman, Joseph Jacob, Samuel Wickham, William Read, Thomas Potter, Nathaniel Coddington & Samuel Collings all of Newport aforesaid, In Behalf of themselves & their Associates have Petitioned this Meeting for a Grant of the Space of Land between the Land of Katherine Sheffield & the Land of Benjamin Durfey for a Wharf with that width over to the Point and from thence Westerly into ye Salt Water &c including the Town Wharf, they agreeing with the Proprietors of sd Wharf &c This Meeting having taken said Petition into Consideration and being sensible of the Advantage it will be to the Town in Gen'l. as also a great ornament to the same which will arise by and at the great expence of the Petitioners and their Associates— DO VOTE and ENACT and hereby grant convey and confirm unto the sd Henry Collins Sam'l. Rodman Henry Bull Clarke Rodman Joseph Jacob Sam'l Wickham Wm. Read Thomas Potter Nath'l. Coddington & Samuel Collins & their associates and to their Heirs & Assigns forever all that Piece or Parcel of Land in Newport aforesaid called the Town Wharf with all the space of Land between the Lands of Katherine Sheffield and the Land of Benjamin Durfey and extending from Thames Street Westward across the Cove or Flats to the Sandy Point called Easton's Point and across the Point Eight hundred feet Westward into the Water towards Goat Island from low water mark. Together with the Privilege of all the Rights the said Town of Newport hath in the Water on the North and South side of the Premises forty-five feet in width on each side they the said Petitioners and Associates agreeing with the Proprietors of the said Town Wharf and those Persons who own the Lots on Sandy Point through which the Premises will

extend and as soon as they can with conveniency to Build
on the Premises a good and substantial Wharf of fifty feet
Wide extending from Thames Street to the Western limits
aforesaid leaving a Channel for the passage of Boats into
the Cove with a good convenient Draw Bridge and always
leaving thirty feet in Width of the said Wharf on the South
side free and clear of buildings & other incumbrances for the
better landing of all sorts of Wood Lumber &c for the benefit
of the Inhabitants according to the Grant in the Year 1702
(1707?), excepting the building of Cranes &c for conveniency
of unloading vessels &c.

TO HAVE AND TO HOLD all the above granted premises
with all & singular the Rights Profits & Privileges & Appur-
tenances to the same belonging or in anywise appertaining
(upon the same Conditions above specified) to them the
said Henry Collins, Sam'l. Rodman, Henry Bull, Clarke
Rodman, Joseph Jacob, Samuel Wickham, Wm. Read,
Thomas Potter, Nath'l. Coddington Sam'l. Collins and
their Associates and their heirs and assigns forever.

Wm. Coddington Junr Dep:   Town Clerk
Past at ye Quarter Meeting ye 3d October, 1739.

Test Wm. Coddington Junr. Dep:   Town Clerk
Recorded in ye Quarter Meeting Book of Newport No 2
Page 519 520 the 9th day of October 1739.

'       Wm. Coddington Junr. Dep:   Town Clerk.
Newport 8th Sept 1800 Recording
by Jonathan Almy, Town Clk."

This vote operated as a grant by the town of land where
Long Wharf is now located.   It must be borne in mind that
the Colonial Act of 1707 granted no title to land to the town
of Newport.   See *Murphy* v. *Bullock*, 20 R. I. 38.   The act
conferred upon the various towns the authority to settle
and improve such lands by "laying out lots", "by building
houses, and warehouses, wharfs," etc., and the authority to
authorize such improvements to be made by others.   The
town was by implication authorized to convey, subject to the

title being defeated in event the improvements were not made; but until improvements were made or, at least, until some action was taken by the town, no title passed.

We will consider the vote of the town to ascertain the intention of the parties and the legal purport of the language used. The record is simply a record of a vote of the freemen of the town. It is not a record of a deed duly executed and delivered. It would appear that the freemen and the persons treated as grantees in the vote considered the vote sufficient to effectuate the intention of the parties and that a deed was unnecessary. In this connection it must be borne in mind that public grants of this nature are to be (2) construed most favorably to the grantor. 29 Cyc. 361; *Engs* v. *Peckham*, 11 R. I. 218-9.

It must be admitted that the language is not as explicit as might be desired but, as was said in *Almy* v. *Church*, 18 R. I. 183: "It is hardly to be expected that the records and conveyancing of an infant colony will show the exactness and technicality which is required at the present time." However, we think from the language of the vote that it is clear that the town intended to convey an estate in fee in the land described and to reserve an easement for the use of the whole people of the colony in the strip of land thirty feet wide on the south side. As one of the conditions of the grant the grantees were required to fill in the land. It does not appear that any consideration for the grant was paid to the town. The record recites "being sensible of the Advantage it will be to the Town in Gen'l. as also a great ornament to the same which will arise by and at the great expence of the Petitioners and their Associates—DO VOTE and ENACT and hereby grant convey," etc. After reciting that a channel should be left open "for the passage of Boats into the Cove with a good convenient Draw Bridge," the following significant language is used: "and always leaving thirty feet in Width of the said Wharf on the South side free and clear of buildings & other incumbrances for the better landing of all sorts of Wood Lumber &c for the benefit of the Inhabitants

according to the Grant in the Year 1702, excepting the building of Cranes &c for conveniency of unloading vessels &c." The *habendum* clause contains in brackets the following: "(upon the same Conditions above specified)". This clause may as readily refer to leaving open a portion of the wharf for the use of the public as it does to the provisions that the whole wharf shall be built and that a channel shall be left open for "the passage of Boats into the Cove with a good convenient Draw Bridge." Requiring the channel and draw bridge that boats may pass in and out of the cove shows an intention to preserve certain rights to the public. If the grant was intended to operate in the nature of a gratuity to the grantees to be used solely by them in a business enterprise and the public was to receive no benefit except the enjoyment of the wharf as "a great ornament", why was the provision inserted requiring that thirty feet on the south side of the wharf be kept "clear of buildings & other incumbrances"? The language continues: "for the better landing of all sorts of Wood Lumber &c for the benefit of the Inhabitants according to the Grant in the Year 1702." The grant referred to is undoubtedly the grant in the Act of 1707, which we have quoted above. The word "Inhabitants" should be construed to mean inhabitants generally and not simply the residents of the town of Newport. The vote of the town uses the language: "for the benefit of the Inhabitants according to the Grant" and the "Grant" concludes with the language: "which we doubt not but will promote the interest of Her Majesty, and the good of her good subjects in said colony, for the promoting of trade and navigation." The grant by the town shows that it was intended that a strip thirty feet wide on the south side of the wharf should be kept open always for public use "for the better landing of all sorts of Wood Lumber &c for the benefit of the Inhabitants according to the Grant in the Year 1702, excepting the building of Cranes &c for conveniency of unloading vessels &c."

We have stated that the language of the vote shows a clear intention to reserve an easement for the public. What was the contemporaneous construction so far as we have any evidence? Time, of course, has removed all eye witnesses to the use of the strip of land thirty feet in width at or near the time when the wharf was constructed. Some of the old residents of Newport however testify that as long ago as they can remember the public used said strip of land freely. What are the physical facts? The north side of the wharf has for a very long time been closely built up while on the south side of the passageway or highway there is a strip of land of a considerable length that has been left comparatively vacant. It is true that the owners of the land on the north side have, as would be expected, made more or less use of the land opposite to their property, such as storing gravel, junk, &c., and some have for a time maintained small structures on the south side opposite to their property and some have made a more or less feeble claim to owning the land on the south side opposite to their holdings on the north. It appears that for a long time a line of posts or spiles, such as are usually on a wharf to be used in tying up vessels, existed along the north line of the land in question and for a considerable distance beyond. The complainant contends that these spiles were there for the purpose of marking the limit of the traveled way. One witness estimated the space between these spiles to be about twenty-five feet. We cannot believe that the spiles were located there to serve in the capacity of a line fence, as it is more reasonable to assume that they were placed there to serve the purpose which similar spiles ordinarily serve when located on a wharf.

The complainant claims title through a line of deeds commencing with a deed by Joseph Southwick to Frederick N. Barlow, December 1, 1854. Said deed purporting to convey and describing land on the north side of the wharf, contained the following language: "Together with the wharf on the south front appertaining to these granted

premises." The next deed in the chain contained following the description of land on the north side, the following: "And also all the grantor's right in the wharf opposite of equal width with the above described premises." Language similar to that last above quoted was inserted in most of the other deeds down to December 19, 1888, on which date John Shanahan deeded to Patrick H. Horgan one-half of the land now owned by the complainant on the north side, the deed containing the following: "Together with one-half of the landing place on the south side of Long Wharf opposite to and south of said granted premises and all of the right, title and interest of the said grantor to the other half of said landing place, however the same may have been acquired by him." The other half of the land directly opposite the land in question was deeded to Patrick H. Horgan, January 4, 1898. In this deed was inserted the following language: "Together also with all the right, title and interest of said grantor in and to said Long Wharf opposite said granted lands and meaning hereby to convey all rights and privileges in said Wharf appurtenant to said granted land." On December 2, 1904, Patrick H. Horgan deeded to J. Ogden Armour the land directly opposite the land in question by a deed which contained the following: "Also that parcel of land or wharf lot directly opposite the first described tract and of the same width bounded Northerly on said street or way and extending Southerly twenty feet more or less therefrom to and bounding Southerly on Newport Harbor. Together with whatever riparian rights connected therewith may belong to the grantor." On May 29, 1909, J. Ogden Armour conveyed to this complainant the land opposite the land in question by deed containing language identical with the language last above quoted to which he added, "together with all trackage rights of the grantor." It would appear from the deeds that the various grantors were not over bold in asserting full title to the land in question until Patrick H. Horgan became interested in the property and one of the deeds to him did not purport to

convey full title but only such right, title and interest as the grantor had in and to land on the south side of the wharf.

The complainant claims title not only by deed but by adverse possession of his ancestors in title for the statutory period. It may be admitted that complainant's ancestors in title have subjected the land in question, to some extent at least, to use adverse to the rights of the public, although the public was never excluded from using the land. However, as the easement was not a private but a public easement the complainant's ancestors in title acquired no rights (3) by adverse user. The adverse use commenced wrongfully and cannot ripen into title against the State. In Rhode Island the doctrine *nullum tempus occurrit regi* prevails. In *Simmons* v. *Cornell*, 1 R. I. 519, it appeared that for more than twenty years a highway had been encroached upon to such an extent that only a very narrow way remained for the use of the public. The court, "without undertaking to determine what would be the legal effect of an entire non-user of the whole way and an exclusive possession by an individual," held that the complainant obtained no title against the State by adverse possession for the statutory period. In *Almy* v. *Church*, 18 R. I. 182, a highway had been obstructed for at least one hundred years. The public had been entirely excluded from the highway. The court, holding that the rule *nullum tempus occurrit regi* applied, said at p. 187: "The case of *Simmons* v. *Cornell, supra,* held this doctrine to the extent of denying the right to gain title to a highway by encroachment; but it did not pass upon the question of an exclusive possession of the whole way. We are unable to see upon what sound principle the right can be denied in one case and not in the other. True it may be said that an entire possession of the way furnishes a presumption of abandonment which does not apply to a partial possession; but it may also be said that if a public right cannot be extinguished in the whole lay out, when enough is left unencumbered for convenient travel, the reason is stronger that the right cannot be extinguished altogether. The

general doctrine of *Simmons* v. *Cornell* has never before been questioned in this State." *Horgan* v. *Town Council*, 32 R. I. 528, affirmed the same doctrine and said, at page 538: "The way having been dedicated to the public, the public right in said way is not lost by non-user or by adverse possession however long continued," citing *Simmons* v. *Cornell, supra, Almy* v. *Church, supra,* and *Knowles* v. *Knowles,* 25 R. I. 325.   The above rule is in accordance with reason and the great weight of authority and is settled so far as this State is concerned.

(4) The complainant's ancestors in title acquired no rights in the land in question by paying taxes thereon and the public lost no rights by the unauthorized acts of the assessors in assessing taxes upon said land.   See *City of Providence* v. *Comstock,* 27 R. I. at 555.

Having arrived at the conclusion that the town in the exercise of the authority conferred by the Act of 1707 reserved to the public an easement in the land in question and that the easement has not been lost, it becomes unnecessary to determine whether said land is a highway by virtue of the proceedings taken by the Board of Aldermen.

Whether the grantees from the town of Newport under the grant of 1739 ever conveyed the fee to the strip of land thirty feet wide, or any portion thereof, on the south side of Long Wharf does not appear.   Nothing has been presented to show that the complainant has title to the land described to the bill and we find that the complainant has no title. The public has not lost its easement.  The complainant being a part of the public has the same right as any other person to enjoy that easement.   But the structure which the complainant has erected interferes with the public use of said land and is in law a public nuisance.

The complainant is not entitled to relief.   The cause is remanded to the Superior Court with direction to enter a decree dismissing the bill.

*Sheffield & Harvey,* for complainant.

*Jeremiah A. Sullivan,* for respondent.