**STATE**

v.

**James IBBISON III et al.**

**No. 81-62-C.A.**

Supreme Court of Rhode Island.

July 20, 1982.

---

Dennis J. Roberts II, Atty. Gen., Barry N. Capalbo, Sp. Asst. Atty. Gen., for plaintiff.

Nardone, Turo & Naccarato, Joseph T. Turo, Westerly, for defendants.

## OPINION

SHEA, Justice.

In this case we consider a question involving the interpretation of a provision of our state constitution. Article I, section 17 of the Rhode Island Constitution, as amended by Art. XXXVII, secs. 1—2, provides that the people of the state "shall continue to enjoy and freely exercise all the rights of fishery, and the privileges of the shore, to which they have been heretofore entitled under the charter and usages of this state." The question raised is this: To what point does the shore extend on its landward boundary? The setting of this boundary will fix the point at which the land held in trust by the state for the enjoyment of all its people ends and private property belonging to littoral owners begins.[1]

The defendants in this case, James Ibbison III, Don E. Morris, Allen E. Zumwalt, James W. Sminkey, Miles R. Stray, and William S. Gavitt were convicted in the Fourth Division District Court on February 2, 1979, of criminal trespass in violation of § 19–17 of the Westerly Code. This section of the code prohibits a person from knowingly entering upon the land of another without having been requested or invited to do so by the owner or occupant of the land. The defendants were each fined $10 plus costs. They appealed their convictions to the Superior Court. On December 9, 1980, a justice of the Superior Court granted defendants' motion to dismiss the charges. The District and Superior Court justices reached different conclusions based on their fixing the boundary between the shore and littoral owners at different points. The state has appealed the dismissals.

Since this case is not before us after a trial in the Superior Court and we have no transcript of the District Court proceedings, there is no record of the facts other than the assertions of counsel. Fortunately, a lengthy recitation of facts is not necessary because the key fact needed for the resolution of this appeal has been stipulated to by the parties.

This dispute arose as defendants were engaged in a beach-clean-up operation in Westerly. As defendants traveled along the beach, they were stopped by Wilfred Kay, a littoral owner, and Patrolman Byron Brown of the Westerly police department. Kay, believing his private property extended to the mean-high-water line, had staked out that line previously. He informed defendants that they were not permitted to cross the landward side of it. The defendants, on the other hand, believed that their right to traverse the shore extended to the high-water mark. This line was defined by defendants in the Superior Court as a visible line on the shore indicated by the reach of an average high tide and further indicated by drifts and seaweed along the shore. It has been stipulated by the parties that defendants had crossed the mean-high-

---

1. "Littoral" is defined as "Belonging to shore, as of seas and great lakes." Black's Law Dictionary 842 (5th ed. 1979). Littoral rights concern properties abutting an ocean, sea, or lake rather than a river or stream (riparian). *Id.*

tide line but were below the high-water mark at the time of their arrest. Also, at the time of the arrest, the mean-high-tide line was under water.

We have referred to the term "high water mark" as used by defendants and accepted by the Superior Court. We shall now discuss the term "mean high tide line." This line is relied upon by the state as the proper boundary, and it is the line accepted by the District Court. The mean high tide is the arithmetic average of high-water heights observed over an 18.6-year Metonic cycle[2]. It is the line that is formed by the intersection of the tidal plane of mean high tide with the shore.

The issue before us is in reality very narrow because the prior decided cases of this court have consistently recognized that the shore lies between high and low water. For example, the shore has been designated as "land below high-water mark," *Armour & Co. v. City of Newport*, 43 R.I. 211, 213, 110 A. 645, 646 (1920); "land below ordinary high-water mark," *Narragansett Real Estate Co. v. MacKenzie*, 34 R.I. 103, 112, 82 A. 804, 806 (1912); "lands covered by tide waters," *City of Providence v. Comstock*, 27 R.I. 537, 542, 65 A. 307, 308 (1906); "all land below high-water mark," *Rhode Island Motor Co. v. City of Providence*, 55 A. 696 (R.I.1903); "the space between high and low-water mark," *Clark v. Peckham*, 10 R.I. 35, 38 (1871).

The problem we face is that none of these cases have defined how the high-water line is to be calculated. Although no prior Rhode Island case explicitly resolves the question before us, there are two cases, however, that are somewhat helpful. In *Allen v. Allen*, 19 R.I. 114, 32 A. 166 (1895), this court stated that "[t]he State holds the legal fee of all lands below high water mark *as at common law*." (Emphasis added.) Next, in *Jackvony v. Powel*, 67 R.I. 218, 21 A.2d 554 (1941), the court held unconstitutional under Art. I, sec. 17 a statute that would have permitted the city of Newport

to erect a fence at Easton's Beach between the high- and low-water marks. *Id.* at 219, 21 A.2d at 554.

At various times in the *Jackvony* case, the court referred to the high-water line or mark, and at other times it referred to the mean high tide. Specifically, with regard to the privileges of the people in the shore, the court referred to the shores as "bordering on tidewaters and lying between the lines of mean high tide and mean low tide." *Id.* at 225, 21 A.2d at 557. We find that the *Jackvony* court used the two terms interchangeably.

The interesting point about the *Allen* case is the court's reliance on the common law in finding that the state holds title to all lands below the high-water mark, *Allen v. Allen*, 19 R.I. at 115, 32 A. at 166, because at common law the boundary was the mean-high-tide-line. Here again, we believe that the *Allen* court uses these terms interchangeably.

It is difficult to discern any real difference between the two positions argued here. By definition, the mean high tide is, in reality, an average high tide. Similarly, defendants have defined the high-water mark in terms of an average. The defendants contend that their high-water mark is such, however, that it is readily observable because of drifts and the presence of seaweed. Our difficulty in accepting this position is that we have absolutely no evidence before us from which we could determine that this is generally true. As noted previously, we are handicapped by the absence of a record in this case. For this reason the only permissible action for us to take is to affix the boundary as was done at common law and which this court in *Allen* declared to be the settled policy of this state.

The common-law background of this issue can be traced back several hundred years. Originally, land titles in England came from a grant from the Crown beginning back during the reign of King John which ended in 1216. These early grants were

2. This cycle begins and ends when a new moon occurs on the same day of the year as it did at the beginning of the last cycle; that is, at the end of a metonic cycle the phases of the moon recur in the same order and on the same days as in the preceding cycle.

imprecise, however, especially because of the lack of definition of the seaward boundary of coastal grants. 1 Clark, *Waters and Water Rights*, § 36.3(A) at 190 (1967). The grantees, however, no doubt viewed their property as extending to the sea.

In 1568–1569, Thomas Digges, a mathematician, engineer, astronomer, and lawyer, wrote a short treatise in which he concluded that the tidelands had not been included in the grants of the seacoasts by the Crown. *Id.* This work went largely unnoticed until 1670 when Sir Matthew Hale incorporated Digges' theory into his very influential treatise *De Jure Maris*. In this work Hale defined the shore as follows:

"The shore is that ground that is between the ordinary highwater and low-water mark. This doth prima facie and of common right belong to the king, both in the shore of the sea and the shore of the arms of the sea." 1 Clark, *supra* at 191 n. 54 (quoting *De Jure Maris*, ch. IV, p. 378, reprinted in Moore, *A History of the Foreshore*, at p. 370.)

After this time, the burden of proof was placed on landowners to show that their particular property extended to the low-water mark, and not the high-water mark. The burden placed this way made it very difficult for landowners to overcome. *Id.* at 191.

This was the state of development of the law in England at the time of the colonization of the eastern shoreline of North America. *Id.* After the Revoluntary War and the formation of our Republic, the individual states retained their own tidelands as they had previously. *Id.* at 192. In a series of United States Supreme Court decisions beginning with *Martin v. Waddell*, 41 U.S. 367, 10 L.Ed. 997 (1842), and culminating with *Borax Consolidated Ltd. v. City of Los Angeles*, 296 U.S. 10, 56 S.Ct. 23, 80 L.Ed. 9 (1935), the Court confirmed individual state ownership of the tidelands.

There had been some uncertainty in the United States regarding whether the boundary was properly at the point of the mean high tide or the mean low tide, but this uncertainty was largely removed in 1935 when it was held in *Borax Consolidated, supra*, that the common-law rule put the boundary between littoral owners and the state at the line of the mean high tide. *Id.* at 22–23, 56 S.Ct. at 29, 80 L.Ed. at 18.

In *Borax Consolidated* the Court reviewed a Court of Appeals decision setting the boundary between land claimed by the plaintiff under a federal preemption patent and the State of California at the mean-high-tide line. The Court analyzed this issue's common-law history in depth including the writings of Sir Matthew Hale and also an influential English decision, *Attorney General v. Chambers*, 4 De G.M. & G. 206. In affirming the Court of Appeals, the Court concluded as follows:

"The tideland extends to the high water mark. This does not mean, as petitioners contend, a physical mark made upon the ground by the waters; it means the line of high water as determined by the course of the tides. By the civil law, the shore extends as far as the highest waves reach in winter. But by the common law, the shore 'is confined to the flux and reflux of the sea at ordinary tides.' It is the land 'between ordinary high and low-water mark, the land over which the daily tides ebb and flow. When, therefore, the sea, or a bay, is named as a boundary, the line of ordinary high-water mark is always intended where the common law prevails.' " [Citations omitted.] *Borax Consolidated Ltd. v. City of Los Angeles*, 296 U.S. at 22–23, 56 S.Ct. at 29, 80 L.Ed. at 18.

Having identified the common-law boundary of the shore as the land between the "ordinary high and low-water mark," the Court described how the line is to be determined since the range of the tide at any given place varies from day to day. At a new moon and a full moon, the range of tides is greater than average because at these particular times, high water rises higher and low water falls lower than usual. The tides at such times are called spring tides. Correspondingly, when the moon is in its first and third quarters, the tide does not rise as high or fall as low as on

the average. During these times, the tides are called neap tides. *Id.* (citing "Tidal Datum Plane," U. S. Coast and Geodetic Survey, Special Publication No. 135, p. 3).

The Court noted that at common law the spring tides, the highest tides of the month, were excluded as the landward boundary of the shore since for the most part this land was dry and not reached by the tides. *Id.* at 24, 56 S.Ct. at 30, 80 L.Ed. at 18. Presumably, the point reached by the spring tides is the same point as that argued by defendants as being the high-water mark evidenced by drifts and seaweed.

■ Recognizing the monthly changes of the tides, the Court recited the following formula, used by the Court of Appeals, for finding the mean-high-tide line:

> "In view of the definition of the mean high tide, as given by the United States Coast and Geodetic Survey, that '[m]ean high water at any place is the average height of all the high waters at that place over a considerable period of time,' and the further observation that 'from theoretical considerations of an astronomical character' there should be a 'periodic variation in the rise of water above sea level having a period of 18.6 years' the Court of Appeals directed that in order to ascertain the mean high tide line with requisite certainty in fixing the boundary of valuable tidelands, such as those here in question appear to be, 'an average of 18.6 years should be determined as near as possible.' We find no error in that instruction." *Id.* at 26–27, 56 S.Ct. at 31, 80 L.Ed. at 20.

We concur in this analysis and apply the mean-high-tide line as the landward boundary of the shore for the purposes of the privileges guaranteed to the people of this state by our constitution. This court has held that the common law governs the rights and obligations of the people of the state unless that law has been modified by our General Assembly. *Traugott v. Petit,* R.I., 404 A.2d 77, 79 (1979); *Benevides v. Kelly,* 90 R.I. 310, 312–13, 316, 157 A.2d 821, 822, 824 (1960); *Lombardi v. California Packing Sales Co.,* 83 R.I. 51, 54, 112 A.2d 701, 702 (1955). *See also Bloomfield v. Brown,* 67 R.I. 452, 25 A.2d 354 (1942); *Allen v. Allen, supra.* Here we apply the common law to govern the interpretation of a constitutional provision.

In fixing the landward boundary of the shore at the mean-high-tide line, we are mindful that there is a disadvantage in that this point is not readily identifiable by the casual observer. We doubt, however, that any boundary could be set that would be readily apparent to an observer when we consider the varied topography of our shoreline. The mean-high-tide line represents the point that can be determined scientifically with the greatest certainty. Clearly, a line determined over a period of years using modern scientific techniques is more precise than a mark made by the changing tides driven by the varying forces of nature. In *Luttes v. State,* 159 Tex. 500, 519, 324 S.W.2d 167, 179 (1958) the Texas court concluded that "common sense suggests a line based on a long term average of daily highest water levels, rather than a line based on some theory of occasional or sporadic highest waters."

Additionally, we feel that our decision best balances the interests between littoral owners and all the people of the state. Setting the boundary at the point where the spring tides reach would unfairly take from littoral owners land that is dry for most of the month. Similarly, setting the boundary below the mean-high-tide line at the line of the mean low tide would so restrict the size of the shore as to render it practically nonexistent.

Finally, setting the boundary as we have done brings us in accord with many of the other states. *People v. William Kent Estate Co.,* 242 Cal.App.2d 156, 51 Cal.Rptr. 215 (1966); *Shorefront Park Improvement Association v. King,* 157 Conn. 249, 253 A.2d 29 (1968); *Wicks v. Howard,* 40 Md.App. 135, 388 A.2d 1250 (1978); *Harrison County v. Guice,* 244 Miss. 95, 140 So.2d 838 (1962); *O'Neill v. State Highway Department,* 50 N.J. 307, 235 A.2d 1 (1967); *Carolina Beach Fishing Pier, Inc. v. Town of Carolina Beach,* 277 N.C. 297, 177 S.E.2d 513 (1970);

*Luttes v. State, supra; Wilson v. Howard*, 5 Wash.App. 169, 486 P.2d 1172 (1971). We note that in a couple of these cases the term "high water mark" is used in place of "mean high tide line". However, this is inconsequential as each state defines the phrase in terms of the mean high tide.

■ This brings us to the actual disposition of this matter. In view of the lack of clarity in early decisions of this court regarding whether the landward boundary of the shoreline was to be computed as a mean or as an absolute high-water mark, we shall affirm the dismissals of the charges by the Superior Court justice but for different reasons. It is well settled that this court may sustain judgments entered below even though we do not accept that court's reasoning. *Mesolella v. City of Providence*, R.I., 439 A.2d 1370 (1982); *Berberian v. Rhode Island Bar Association*, R.I., 424 A.2d 1072 (1981); *Mercier v. City of Central Falls*, R.I., 412 A.2d 927 (1980).

We affirm the dismissals since basic due process provides that no man shall be held criminally responsible for conduct that he could not reasonably understand to be proscribed. *United States v. Harriss*, 347 U.S. 612, 617, 74 S.Ct. 808, 812, 98 L.Ed. 989, 996 (1954); *State v. Tweedie*, R.I., 444 A.2d 855 (1982). Although this situation most often occurs when statutes are challenged for vagueness, we find that the facts of this case are such that these defendants are entitled to similar protection.

■ In the future, any municipality that intends to impose criminal penalties for trespass on waterfront property above the mean-high-tide line must prove beyond reasonable doubt that the defendant knew the location of the boundary line and intentionally trespassed across it.

For the reasons stated, the appeal is denied and dismissed, the granting of the motion to dismiss is affirmed, and the papers of the case are remanded to the Superior Court.