DECISION
Before the Court is Plaintiff, State of Rhode Island Coastal Resource Management Council's ("CRMC" or "Council"), motion to adjudge Defendant, Carl Bolender ("Bolender"), in contempt of this Court's order and decision in C.A. No. 86-3076. Additionally, CRMC requests a preliminary and permanent injunction enjoining Bolender from using his structures, docks, floats, or moorings, located adjacent to the Long Wharf-area in Newport Harbor, and requiring Bolender to dissemble and remove all structures, docks, floats, or moorings unless or until Bolender receives assent from CRMC. Jurisdiction is pursuant to General Laws 1956 §§ 8-6-1 and 8-2-13.
 Facts/Travel
The matter currently before this Court has a relatively long history, a portion of which has previously been discussed by this Court in C.A. 86-3076. See William Miner v. City of Newport, etal, C.A. 86-3076, March 3, 1988, Caldarone, J. For purposes of convenience and clarity, this Court will reiterate the facts as discussed by Justice Caldarone as well as expand on the instant matter.
On or about September 2, 1977, Bolender entered into a four year lease with the City of Newport ("City") to "construct and maintain a floating dock facility and floating finger piers" within the northeast corner of Newport Harbor bordered by the southerly side of the Long Wharf sea wall. Id. at 2. During the term of Bolender's lease, the City sought permission, from CRMC, to build a floating dock located in the area to be utilized by Bolender. Id. CRMC denied this request.[1] Subsequently, in 1981, the City filed another application with CRMC. Id. This application, which requested assent to construct three floating docks in the same area located adjacent to the Long Wharf in Newport Harbor, was also denied. Id. at 2-3.
On or about April 16, 1982, Bolender's lease with the City was renegotiated. See Lease dated April 16, 1982 at 2. In pertinent part, the new lease provided:
 "This lease agreement has been made in order that the lessee may construct and maintain a floating dock facility within the above-described area. The decision to construct and maintain said floating dock facility shall be solely within the discretion of the Lessee. The Lessee may place moorings on the premises, including moorings placed for rental to the public, with or without floats or floating docks."
After the inception of the lease, Bolender began to operate a mooring system on the leased premises. See Miner, C.A. 86-3076, March 3, 1988, at 3. Although Bolender obtained a permit from the Newport Recreation Department, neither Bolender nor the City obtained approval from CRMC. Id.
By letter dated May 16, 1983, CRMC notified Bolender that it was issuing a cease and desist order for Bolender's marina operation. On or about May 25, 1983, Bolender commenced an action in Superior Court. See C.A. 83-2522. In that action, Bolender requested that the Court enjoin CRMC from enforcing a cease and desist order forbidding Bolender from operating a mooring operation located in Newport Harbor. In accordance with Bolender's request, a temporary restraining order was issued on June 17, 1983.[2]
In 1986, CRMC issued the City a cease and desist order to stop Bolender from placing floats in his mooring system. SeeMiner, C.A. 86-3076, March 3, 1988 at 3. Thereafter, in 1986, Judge Gibney issued a temporary restraining order enjoining Bolender from operating his facility and ordering him to remove the floats. Id.; See C.A. 86-3076. Bolender, who proceeded to operate his facility, was ultimately found in technical contempt.Id. Bolender was given the opportunity to purge himself of the contempt by removing the floats from the mooring system. Id.
The matter proceeded to the non-jury trial calendar before this Superior Court, Caldarone, J. On or about March 3, 1988, the Court issued a written decision granting CRMC's request for injunctive relief.[3] The decision, which was incorporated into a judgment entered on July 27, 1996, ordered Bolender to "disassemble and remove all floating docks or other floating equipment . . . utilized to allow direct access from the moorings to the shore or to the Long Wharf sea wall located in the northeast corner of the Newport Harbor . . ." Id. at 9. Further, Bolender was "permanently enjoined and restrained from constructing any form of floating docks or other systems of wharves extending from the . . . Long Wharf sea wall to any of the moorings in the absence of approval by CRMC." Id. at 10. Finally, although the Court restrained the City from granting Bolender [or other entities] a license for constructing and/or maintaining a floating dock facility within the Newport Harbor without CRMC approval, it recognized the lawful applicability of G.L. § 46-4-6.6. The Court stated:
 "The court finds that the lawful applicability of § 46-4-6.6
precludes the court from enjoining the defendant Bolender from operating or the City of Newport from granting a license for the operation of mooring or anchorage operation in the general area of Long Wharf or in any other area of Newport City harbor." Id.
In 1992, the City filed another application, with CRMC, on Bolender's behalf. This application requested an assent for a 48 boat marina facility. The facility was to include a floating "dockmasters barge" along with a "boat sewage pumpout facility."See Trial Exhibit 13. This application was ultimately withdrawn by the City in 1996. See Trial Exhibit 13 at 2-3.[4]
In 1993 CRMC issued a cease and desist order to Bolender. See
Trial Exhibit E. In pertinent part, this order alleged that Bolender was "maintaining floating docks or other systems of wharves extending from Long Wharf, in Newport, Rhode Island, without benefit of a CRMC assent and in violation of court order #86-3076." Id. In response to this order Bolender submitted a letter to CRMC. See Trial Exhibit M. Additionally, counsel for Bolender also communicated with CRMC's attorney, denying the existence of any violation. See Trial Exhibit F.
On or about June 13, 1995, CRMC issued another cease and desist order to Bolender. See Trial Exhibit 18. In pertinent part, this order alleged that Bolender had "undertaken construction renovations to a commercial structure within the tidal waters of the state of Rhode Island adjacent to Long Wharf . . . without benefit of a CRMC assent or in violation of a council order." Id. In response to this order, Bolender once again submitted a letter to CRMC. See Trial Exhibit 19.
In 1997, CRMC moved this Court to hold Bolender in civil contempt of this Court's order and decision in C.A. 86-3076. Also, in 1997, CRMC petitioned for injunctive relief. On or about November 17, 1997, this Court issued an order consolidating C.A. 86-3076 and C.A. 97-4918. See Order Dated November 11, 1997, Silverstein, J. At trial testimony was heard from the respective parties and their witnesses.
The CRMC contends that it has satisfied all of the necessary criteria entitling it to injunctive relief. Specifically, CRMC argues that Bolender is in violation of the CRMC act, as well as the CRMP. Further, CRMC contends that the Rhode Island Supreme Court's decision in Armour Co. v. City of Newport, 43 R.I. 211,110 A. 645 (1920)[5] precludes CRMC from issuing Bolender an assent. Finally, CRMC argues that the City is a necessary party to any application submitted to CRMC.
 A. Contempt
The CRMC argues that Bolender is in civil contempt of Judge Caldarone's order. Bolender disputes CRMC's assertions, contending that there is no basis, factually or legally, to hold him in civil contempt.
It is well established that the matter of contempt is within the sound discretion of the trial justice. Durfee v. Ocean StateSteel Inc., 636 A.2d 698, 704 (R.I. 1994) (citing Brierly v.Brierly, 431 A.2d 410, 412 (R.I. 1981)); See also SchoolCommittee v. Town of North Providence Federation of Teachers,Local 920, 468 A.2d 272, 276 (R.I. 1983); Marek v. Marek,383 A.2d 1031, 1032 (R.I. 1978); Shonting v. Shonting, 118 R.I. 475, 478,374 A.2d 797, 798 (R.I. 1977); Tente v. Tente, 112 R.I. 636, 639,314 A.2d 149, 151 (1974). The purpose of civil contempt is to "coerce the contemptor into compliance with the court order and to compensate the complaining party for losses sustained."Durfee, 636 A.2d at 704 (citing Ventures Management Co. v.Geruso, 434 A.2d 252, 254 (R.I. 1981). "`The hallmark of civil contempt [is] the ability to purge the contempt at will. . . .'"Id. (quoting In re Carrie T., 516 A.2d 883, 885 (R.I. 1986)).
Civil contempt is proven when it is demonstrated, by clear and convincing evidence, that a lawful decree has been violated.Id. at 704. "A finding of civil contempt must be based on a party's lack of substantial compliance with a court order, demonstrated by a failure of a party `to employs the utmost diligence in discharging [its] . . . responsibilities.'" Id.
(quoting Natural Resources Defenses Council, Inc. v. Train,510 F.2d 692, 713 (D.C. Cir. 1975). Substantial compliance is dependent on the circumstances of the case, that includes "`the nature of the interest at stake and the degree to which noncompliance affects that interest.'" Id. at 704-05 (quotingFortin v. Commissioner of Massachusetts Department of PublicWelfare, 692 F.2d 790, 795 (1st Cir. 1982)
After hearing from the parties and reviewing the circumstances surrounding litigation, this court does not find clear and convincing evidence that the defendant was in civil contempt of Justice Caldarone's ruling. First, this Court notes the actions of CRMC, in "dragging its heels" for almost ten years. Although, Justice Caldarone's decision was issued in March of 1988, judgment was not entered until July of 1996. CRMC has essentially taken no action to enforce this judgment prior to its filing a motion to enforce in 1997; that is, after CRMC monitoring reports contended that Bolender was in violation of the Superior Court action. See Trial Exhibit 7.
As stated supra, a finding of contempt is within the sound discretion of the trial judge. This Court will not, except under unique circumstances, which are not found here, find a party in contempt of court where the alleged contempt has continued since the Caldarone decision and where CRMC has countenanced the situation at bar by delaying enforcement efforts for such an elongated period of time.
Furthermore, the record demonstrates that Bolender has made some effort to comply with Judge Caldarone's decision. Bolender testified that after the conclusion of the 1987 trial, he removed the "main line and the T." (Tr. 3-26-98, pg. 65). Accordingly, this Court declines to find Bolender in civil contempt. Defendants other arguments, including estoppel with respect to contempt, thus are rendered moot.
 B. Preliminary Injunction
The decision to grant or deny a preliminary injunction falls within the sound discretion of the trial justice. Fund ForCommunity Progress v. United Way, 695 A.2d 517, 521 (R.I. 1997);See also Pine V. Kalian, No. 98-146, Slip Op. at 2 (R.I., filed October 28, 1998). Recently, in United Way, the Rhode Island Supreme Court articulated the well-established standard for denying or granting a preliminary injunction. First, in order to be successful, the moving party must demonstrate a "likelihood of success on the merits." Id. The "likelihood of success" element is satisfied when a moving party is able to present a "prima facie case." Id. Next, the moving party must show "that it stands to suffer some irreparable harm that is presently threatened or imminent and for which no adequate legal remedy exists to restore that plaintiff to its rightful position." Id. (citing Brown v.Amaral, 460 A.2d 7, 10 (R.I. 1983); Rhode Island Turnpike Bridge Authority v. Cohen, 433 A.2d 179, 182 (R.I. 1981);Coolbeth v. Berberian, 112 R.I. 558, 564, 313 A.2d 656, 659 (1974). Finally, the trial justice performs a type of equitable balancing test. The judge "consider[s] the equities of the case by examining the hardship to the moving party if the injunction is denied, the hardship to the opposing party if the injunction is granted and the public interest in denying or granting the requested relief." United Way, 695 A.2d at 521 (citation omitted).
The CRMC argues inter alia that Bolender is in violation of the CRMC act as well as the Coastal Resource Management Program ("CRMP"). Bolender disputes CRMC's assertions contending that CRMC's claim is barred by the doctrines of res judicata and collateral estoppel. Also, Bolender argues that the doctrine of equitable estoppel is applicable. Finally, Bolender contends that a mooring business falls within the exclusive jurisdiction of the City of Newport. See G.L. Section 44-4-6.6[6].
 Res Judicata
"The doctrine of res judicata relates to the effect of a final judgment between the parties to an action and those in privity with those parties." E. W. Audet Sons v. Fireman's FundIns., 635 A.2d 1181, 1186 (R.I. 1994) (citing Providence TeachersUnion, Local 958-American Federation of Teachers, AFL-CIO v.McGovern, 113 R.I. 169, 172, 319 A.2d 358, 361 (1974)). The fundamental policy behind this doctrine is to economize court time and reduce financial burden. Elgabri v. Lekas, 681 A.2d 271, 275 (R.I. 1996). When it is invoked, res judicata makes a prior judgment in a civil action between the same parties decisive with respect to any issues that were litigated in the previous action, or, that could have been raised and litigated. Id. Res judicata functions as a complete bar to a subsequent cause of action when there exists: (1) an identity of parties, (2) an identity of issues, and (3) a finality of judgment in the earlier action. Audit, 635 A.2d at 1186.
 Collateral Estoppel
Collateral estoppel makes conclusive, in a later action based on a different claim, the determination of only those issues, which were actually litigated in a previous action. Audit, 635 A.2d at 1186. The prerequisite elements for application of this doctrine are (1) identity of issues, (2) final judgment on the merits, and (3) a showing that the party against whom collateral estoppel is asserted is the same or in privity with a party in the previous proceeding. Id. In State v. Chase, 588 A.2d 120, 123 (R.I. 1991), the identity of issues requirement is further divided into three factors. Those being: (1) that the issue to be precluded be identical to the issue in the previous proceeding; (2) that the issue must have actually been litigated; and (3) that the issue must have necessarily been determined.
After reviewing the testimony, photographs and exhibits submitted, this Court concludes that the doctrines of res judicata and collateral estoppel do not bar CRMC's request for injunctive relief in C.A. 97-4918, as the identity of issues element has not been satisfied. There is no question that Bolender's facility has changed since this matter was before Judge Caldarone. While testifying, Bolender conceded that his facility has changed since the 1987 trial before Judge Caldarone. Bolender stated that after the conclusion of the 1987 trial, he removed the "main line and the T" (Tr. 3-26-98, pg. 65):
"Q: And what was your understanding of what you had to do at the conclusion of that trial?
A: We had to remove —
Q: Want me to take it down?
A: Sure. We had to remove all that main line. The moorings were still there, and remove the main line and the T." Id. at 64-65.
As the issue before this Court involves the facility as it exists today, this Court concludes that the doctrines of res judicata and collateral estoppel are inapplicable to the instant action.
 Equitable Estoppel
Bolender argues that the doctrine of estoppel precludes CRMC's request for injunctive relief.[7] The doctrine of estoppel is rooted in equity. This type of relief is "extraordinary and will not be applied unless the equities clearly must be balanced in favor of the parties seeking relief under this doctrine." Greenwich Bay Yacht Basin Assoc. v. Brown,537 A.2d 988, 991 (R.I. 1988); See also Ocean Road Partners v.State, 612 A.2d 1107, 1111 (R.I. 1992). Equitable estoppel can be applied as against private parties as well as governmental authorities. Greenwich Bay, 537 A.2d, at 991. Where justice requires, this doctrine may also be applied against administrative agencies and municipal authorities. Id. at 991 (citing Loiselle v. City of East Providence, 116 R.I. 585,359 A.2d 345 (1976); Schiavulli v. School Committee of NorthProvidence, 114 R.I. 443, 334 A.2d 416 (1975); Ferrelli v.Department of Employment Security, 106 R.I. 588, 261 A.2d 906
(1970)).
 As defined by our state Supreme Court,
 "`the indispensable elements of equitable estoppel, or estoppel in pais, are: `first, an affirmative representation or equivalent conduct on the part of the person against whom the estoppel is claimed which is directed to another for the purpose of inducing the other to act or fail to act in reliance thereon; and secondly, that such representation or conduct did induce the other to act or fail to act to his injury.'" Providence Teachers Union v. School Bd., 689 A.2d 388
(R.I. 1997) (quoting Lichtenstein v. Parness, 81 R.I. 135, 138, 99 A.2d 3, 5 (1953)).
See e.g., Greenwich Bay, 537 A.2d at 990-92 (if proven, allegations set forth in complaint and affidavit asserting CRMC had assured plaintiffs their application would be judged in accordance with earlier program regulations, would warrant application of equitable estoppel). "The key element of an estoppel is intentionally induced prejudicial reliance." E.Greenwich Yacht Club v. Coastal Res. Mgt. Council, 118 R.I. 559, 568, 376 A.2d 682 (R.I. 1977) (citing Raymond v. B.I.F.Industries Inc., 112 R.I. 192. 198-99. 308 A.2d 820, 823 (1973)). Although mere non-action is generally insufficient to warrant application of this doctrine, Ferrelli, 261 A.2d at 909, silence can form the basis of estoppel if "there exists a duty not to remain silent as where the circumstances require one to speak lest such silence would reasonably mislead another to rely thereon to his detriment." Schiavulli, 334 A.2d at 419 (citation omitted) (estoppel applied to prevent a school committee from denying that a teachers absence was the result of her being on a leave of absence where school superintendent told teacher he would convey her request for leave of absense and committee failed to act). See also Murphy v. Duffy, 46 R.I. 210, 124 A. 103
(R.I. 1924) (estoppel applicable to prevent town from asserting school was being constructed at a location which had not been approved by town school committee where school committee acquiesced to work which contractor was doing).
After reviewing the parties memoranda's, exhibits, and transcripts of hearings, this Court declines to apply the doctrine of equitable estoppel to the case at bar. There is no indication that CRMC ever affirmatively represented that Bolender's operation was permissible and would be permitted to continue forever, warranting his reasonable reliance thereon.
Additionally, it is evident that the silence exception has no application in the instant matter. First, this Court notes that "an actor may not base a claim of estoppel in its favor upon its own wrongful acts." Wellington Hotel Associates v. Miner,543 A.2d 656, 661 (R.I. 1988). Equitable estoppel will not lie where a party has notice of his continuing violation. Id. (citingLoiselle, 359 A.2d at 349) (municipalities action to terminate an employee was not precluded by equitable estoppel where employee had notice of violation of city ordinance, albeit the fact that the city did not act for a period of approximately two years).
The record evidences that Mr. Bolender had notice of CRMC's position with respect to his facility. First, during his testimony, Bolender acknowledged receipt of the two cease and desist orders issued by CRMC in 1993, See Trial Exhibit E; (Tr. 3-26-98, p. 69), and 1995, See Trial Exhibit 18;(Tr. 4-22-98, pg. 17). Further, there is no question that Bolender knew of the City's 1992 application for assent, which was pending on his behalf.[8] See Trial Exhibit 13; (Tr. 4-22-98, pg. 3). Finally, the record contains a letter, written by one Paul Martellino at Bolender's request, indicating an awareness of delays in the City's application because of the Armour decision. See supra; Trial Exhibit 13 at 32-33.
In conclusion, this Court finds that equitable estoppel does not bar the CRMC's action. As such, this Court now proceeds in determining whether the CRMC has met is burden for injunctive relief.
 CRMC
In 1971, the Rhode Island Coastal Resource Management Council was created. The agency was bestowed with the "primary responsibility" of "planning for and management of the resources of the state's coastal region." G.L. 1956 § 46-23-6. The Legislature, in recognizing that the "coastal resources of Rhode Island . . . are of immediate and potential value to the present and future development of this state," instituted a policy in order
 "to preserve, protect, develop, and where possible, restore the coastal resources of the state for this and succeeding generations through comprehensive and coordinated long range planning and management designed to produce the maximum benefit for society from these coastal resources. . . ." G.L § 46-23-1 (a).
This grant of authority, to CRMC, has been deemed to be in accordance with the Rhode Island Constitution. Milardo v. CoastalResources Management Council, 434 A.2d 266, 272 (1981).
The CRMC possesses jurisdiction over both land and water areas. Ratcliffe v. Coastal Resources Management Counsel,584 A.2d 1107, 1110 (R.I. 1991). Although CRMC's authority over land areas is limited,[9] its authority over developments or operations within the tidal water is quite broad. This broad authority is illustrated by the language of G.L. § 46-23-6
(2), which empowers CRMC "to approve, modify set conditions for, or reject . . . proposal[s]" for "development[s] or operation[s] within, above, or beneath the tidal water below the mean high water mark. . . ." Specifically, § 46-23-6 (2)(ii)(A) provides:
 "Any person, firm, or governmental agency proposing any development or operation within, above, or beneath the tidal water below the high water mark, extending out to the extent of the state's jurisdiction in the territorial sea, shall be required to demonstrate that its proposal would not:
 (I) Conflict with any resources management plan or program adopted by the council;
 (II) Make any area unsuitable for any uses or activities to which it is allocated by a resources management plan or program adopted by the council; or
 (III) Significantly damage the environment of the coastal region.
 (B) The council shall be authorized to approve, modify set conditions for, or reject any such proposal."
Pursuant to its enabling legislation, CRMC is vested with a panoply of powers and duties. See G.L. § 46-23-6. Those include, the power "to formulate policies and plans and to adopt regulations necessary to implement its various management programs;" the power to "issue, modify, or deny permits for any work in, above, or beneath the areas under its jurisdiction, including conduct of any form of aquaculture;" and the power to "grant licenses, permits and easements for the use of coastal resources which are held in trust by the state for all its citizens. . . ." See G.L. §§ 46-23-6 (2)(i), 46-23-6 (4)(i),46-23-6 (4)(iii). In those instances where there has been a violation of the CRMC program or its regulations, CRMC is empowered to issue cease and desist orders. See G.L. §46-23-7.
As stated supra CRMC has the power to adopt plans in order to implement its management programs. As such, CRMC has developed the CRMP.[10] Pertinent to the litigation before this Court is the language contained in CRMP Section 100.1 as well as the definitions of a marina and a floating business, both of which are contained in CRMP §§ 300.4 and 300.5. Respectively, those sections provide:
 "100.1 Tidal Waters, Shoreline Features, and Contiguous Areas
 A. A council Assent is required for any alteration or activity that are proposed for (1) tidal waters within the territorial seas . . ."
 300.4 Recreational Boating Facilities[11]
 A. Definitions
 1. Marina: any dock, pier, wharf, float, floating business, or combination of such facilities that accommodate five or more recreational boats
 300.5 Mooring and Anchoring of Houseboats and Floating Businesses
 2. Floating business: a building constructed on a raft or hull that is represented as a place of business, including but not limited to waterborne hotels, restaurants, marinas or marina-related businesses."
After reviewing the testimony, including that of Mr. Fugate, CRMC's Executive Director, the photographs of Mr. Bolender's large scale operation, and the several exhibits submitted, this Court finds that Bolender's facility is presently a marina and floating business, falling within the jurisdiction of CRMC, and not a mooring facility under the jurisdiction of the City of Newport.[12] In his affidavit, Grover Fugate opined that Bolender's operation meets the definition of a marina and floating business. See affidavit of Grover Fugate, CRMC's Complaint For Injunctive Relief, Exhibit A para. 33; See alsoPawtucket Power Assoc. v. Pawtucket, 622 A.2d 452, 456 (1993) (citations omitted) ("deference will be accorded to an administrative agency when it interprets a statute whose administration and enforcement have been entrusted to the agency.") This position was further supported by the testimony of the defendant, Carl Bolender.[13]
During his testimony Bolender acknowledged ownership of the barge, "Defiance," along with the floating dock which surrounds that very same barge. (Tr. 4-22-97, pg. 19).[14] Bolender agreed that there were more than five boats attached to those docks and that his business supplies electricity and water to some of those boats. (Id. at 19-20). Furthers Bolender agreed that he has, for several years, used the barge to conduct business. (Id. at 26.)
In conclusion, this Court finds that CRMC clearly possesses jurisdiction over Bolender's operation. As such, the likelihood of success element has certainly been met, as CRMC may, pursuant to its statutory duties, regulate facilities such as Mr. Bolender's. This Court need not entertain CRMC's additional arguments at this time.
Upon reviewing the standard as discussed in United Way this Court is satisfied that CRMC is entitled to injunctive relief. Without the relief requested, CRMC will suffer immediate irreparable harm. If Bolender is permitted to operate his facility, in derogation of the CRMC act and the CRMP, such operation will have a negative impact upon CRMC's statutory mandate to manage the state's coastal resources. Additionally, in considering the equities of this case, this Court concludes that injunctive relief is warranted. The harm to CRMC, and the public interest in granting CRMC's requested relief clearly outweighs any harm to Bolender. CRMC's statutory policy of "preserv[ing], protect[ing], develop[ing], and . . . restor[ing] the coastal resources of the state. . . ." clearly outweighs any interest Bolender may have in keeping his facility. See G.L 1956 §46-23-1 (a). The very essence of this legislation was in effect "essential to the social and economic well-being of the people of Rhode Island. . . ." See G.L. 1956 § 46-23-1 (b).
Furthermore, it should be noted, the evidence of record indicates that the City of Newport, the state of Rhode Island, and the federal government have allotted substantial sums of money in order to construct a water-taxi operation that will connect Newport with other state water regions, serving as an inter modal system of transportation. This money could be lost if Bolender's operation is permitted to remain.
In conclusion, this Court is satisfied that CRMC has met its burden in demonstrating its entitlement to injunctive relief on the facts before this Court. As such, this Court grants CRMC's petition for preliminary and permanent injunctive relief.
 Conclusion
In conclusion, this Court, in exercising its discretion, declines to hold Bolender in civil contempt of the decision and order entered in C.A 86-3076. This Court grants CRMC's prayer for injunctive relief.
Counsel for CRMC shall submit an appropriate order for entry after giving reasonable notice to counsel for Bolender.
[1] This decision was affirmed on appeal to the Superior Court.See Carl W. Bolender, d/b/a Newport Bay Associates v. CoastalResource Management Council, C.A. 79-245, August 19, 1981, Cochran, J.
[2] C.A. 83-2522 and C.A. 86-3076 were ultimately consolidated by stipulation.
[3] In his decision, Judge Caldarone acknowledged that Bolender's facility was more than a mooring or anchorage operation simply falling under the jurisdiction of Newport. SeeMiner, C.A. No. 86-3076, March 3, 1988 at 7. G.L. § 46-4-6.6.
[4] CRMC approved the City's request to withdraw its application. See Trial Exhibit 13 at 1.
[5] In Armour, the Rhode Island Supreme Court held that a reservation, which was contained in the 1739 vote of the Freemen of Newport, manifested an intention to reserve a thirty (30) foot public easement on the south side of Long Wharf located in Newport, Rhode Island. Id. at 646-47.
[6] Similarly, Bolender argues inter alia that the law of the case doctrine applies to the issue of the City's ability to regulate his mooring field. Without even reaching the merits of this contention, this Court rejects Bolender's argument. This Court does not deny Newport's authority to regulate moorings under the provisions of G.L. 44-4-6.6. It merely concludes that Bolender's facility is not a mooring facility under the jurisdiction of the City of Newport.
[7] The Court is satisfied that the equitable defense of laches does not bar CRMC's action. See O'Reilly v. Town of Glocester,621 A.2d 697, 703 (R.I. 1993) (equitable defense of laches is generally inapplicable when government is suing a private party in order to assert a public right).
[8] The City of Newport ultimately withdrew this application.See Trial Exhibit 13 at 4.
[9] Section 46-23-6 (2)(B)(iii) of the Rhode Island General Laws provides:
 "The authority of the council over land areas (those areas above the mean high water mark) shall be limited to two hundred feet (200') from the coastal physiographical feature or to that necessary to carry out effective resource management programs. This shall be limited to the authority to approve, modify, set conditions for, or reject the design, location, construction, alteration, and operation of specified activities or land uses when these are related to a water area under the agency's jurisdiction, regardless of their actual location. The council's authority over these land uses and activities shall be limited to situations in which there is a reasonable probability of conflict with a plan or program for resources management or damage to the coastal environment."
[10] The CRMP has been amended since this action was filed in 1997; however, the sections cited have not changed.
[11] According to the CRMP, recreational boating facilit[ies] include "marinas, launching ramps, residential boating facilities, recreational wharves, piers and slips, floats or floating docks, and recreational mooring areas." See CRMP Section 300.4 (A) Definitions.
[12] Section 46-4-6.6 of the Rhode Island General Laws provides:
 The provisions of § 46-22-14, or any other provisions of the general laws notwithstanding, and in addition to any authority and powers conferred upon the city council of the city of Newport, authority shall also be granted to the city council of the city of Newport to authorize for the appointment of a harbor coordinator and by ordinance grant such authority as the city council may deem necessary to the harbor coordinator for the enforcement and supervision of any ordinances, rules, and regulations governing the public waters within its jurisdiction, and to regulate by ordinance the speed, management, and control of all vessels and the size, type, location, and use of all anchorages and moorings, within the public waters within the confines of the city including, without limiting the generality of the foregoing, the authority and power to prohibit waterskiing on any of the public waters, to designate upon a map of the public waters within the city the places where permanent or temporary moorings or anchorages may be maintained, to assign moorings, to remove moorings, to collect a fee for the use of moorings, to provide for minimum mooring specifications, to provide regulations for houseboats that are not self-propelled, to provide regulations for regattas, races, marine parades, tournaments, and exhibitions, to provide for the removal of wrecks or derelicts or abandoned boats or docks, and to impose penalties for violators of the ordinances, not to exceed in amount three hundred dollars ($300) or imprisonment not exceeding ten (10) days in some jail or house of correction, for any one offense, the fines to be recovered to the use of the city.
[13] Bolender does not deny the fact that he has not acquired an assent from CRMC. See Bolender's Pre-Trial Memorandum at 13.
[14] During this portion of his testimony, Bolender was describing what was depicted in photographs of his vessel taken in July of 1997. See Trial Exhibit 7, 1997 photographs 10-11.