DECISION
Before this Court for decision are cross motions for summary judgment filed by Plaintiffs Night Sisters Corporation, Inc. and Steven A. Simoni, as Trustee of the Capriccio Land Trust, and Defendants Hog Island, Inc. and South End Association. The Court has reviewed the evidence and the applicable law, together with the parties' legal memoranda and oral arguments, and now issues this written decision.
 Facts and Travel
This case concerns access to roads, docks, and a deep well[1]
located in a region known as Hog Island, to which Plaintiffs Night Sisters Corporation, Inc. and Steven A. Simoni, as Trustee of the Capriccio Land Trust ("Plaintiffs"), claim that they have been wrongfully denied access. Hog Island is located in Narragansett Bay and is part of Portsmouth, Rhode Island. Plaintiffs own property on the southerly portion of Hog *Page 2 
Island described as Lots 2, 17A, 173, 174, and 175 of the Town of Portsmouth's Tax Assessor's Map. Defendant Hog Island, Inc. is the owner of other real property located on the island, including property that contains the deep well and the areas where the docks that are the subject of this lawsuit are located. Defendant South End Association ("SEA") is composed of property owners from the southerly portion of Hog Island, and provides services to its members, including maintenance of the system of pipes and hoses that distribute water to the houses and cottages that are connected to the deep well. Due to the complexity of the legal issues presented in this motion, a brief discussion of Hog Island's unique history and development is necessary.
Hog Island was purchased by Walter Harris Knight in 1901. At some point during the early 1900s, Mr. Knight dug the deep well at issue in the present case in the northern part of the island. In 1921, Mr. Knight's daughters and their respective husbands acquired the island. A subdivision plat known as the "Waterman Plan" was recorded in 1923, which divided the southern part of the island into 126 lots and also identified the six rights-of-way[2] currently in dispute. See Pl.'sEx. 7. In 1929, Knight's daughters and their spouses formed Hog Island, Inc. for the purpose of "acquiring, holding, using, managing, selling . . . real estate" on Hog Island and transferred to the newly formed corporation their rights, title and interest in the island. For more than a century, access onto the island typically was gained by a public ferry which utilized a dock on the eastern part of Hog Island known as "Ferry Dock." However, ferry service to the island ceased in the summer of 2002. According to Plaintiffs, the "Ferry Dock" *Page 3 
has also served as the "main landing place" for residents of Hog Island to dock their boats.
Over the years, many of the lots located in the 1923 subdivision plat were deeded out, including Lots 2 and 17A. More specifically, Lot 2 and Lot 17A were sold to Plaintiffs' predecessors-in-interest in 1930 and 1933, respectively. Plaintiff Night Sisters Corporation, Inc. currently holds title to both lots, having purchased Lot 2 in 2002 and Lot 17A in 2001. Houses and cottages have been constructed on many of the lots located within the "Waterman Plan;" however, Lots 2 and 17A have remained undeveloped since the time they were sold to Plaintiffs' predecessors. While Hog Island, Inc. apparently has permitted many owners of houses and cottages in the south end of the island to tie into its deep well, there is no evidence that Lots 2 and 17A were ever connected to this water source. Additionally, according to the parties, under existing zoning regulations, both lots are too small to contain a well and a dwelling structure.
Lots 173, 174, and 175, which are located on the southwesterly side of Hog Island, were conveyed to Plaintiffs' predecessors-in-interest in 1974 as part of a settlement agreement from a shareholders' derivative action filed against Hog Island, Inc. in 1969. Lot 175 was acquired by Plaintiff Steven A. Simoni, as Trustee of the Capriccio Land Trust, in 1986, while Plaintiff Night Sisters Corporation, Inc. purchased Lots 174 and 173 in 2001 and 2002, respectively. The deeds to all three lots reference a 1974 subdivision plat known as the "Waterman Survey,"see Pl.'s Ex. 17A, 17B 17C, which depicts several rights-of-way.[3]See Pl.'s Ex. 6. Additionally, Lot 173 contains a *Page 4 
well, which was dug by Plaintiffs' predecessor, and there is no evidence to suggest that it would be impossible for Plaintiffs to do the same on Lots 174 and/or 175.
Plaintiffs assert that they possess certain express or implied easements which grant them the right to use the deep well, the platted rights-of-way, and the "Ferry Dock." They additionally claim the right to construct a personal dock on Hog Island, Inc.'s shoreline property adjacent to Lots 2 and 17A. They also argue that Defendants have interfered with their use of the easements. Specifically, Steven A. Simoni states that he has been a member of SEA since 1986. According to the complaint, although Hog Island, Inc. has consistently allowed SEA members to access the deep well in order to retrieve freshwater, it has denied Plaintiffs such access.[4] Plaintiffs further assert that Defendants wrongfully denied them access to use the aforementioned rights-of-ways and the "Ferry Dock." Finally, Plaintiffs allege that despite the fact that many owners of lots on Riverside Drive and Southside Drive were granted permission to construct personal docks on Hog Island, Inc.'s shoreline property, Defendants denied Plaintiffs' requests to build a dock adjacent to Lots 2 and 17A.
Plaintiffs have moved for summary judgment on Counts I, II, III, and IV of their second amended complaint. In Count I, Plaintiffs allege that an order from a Superior Court case filed in 1969 granted to their predecessors-in-interest the right to tie Lots 173, 174, and 175 into the deep well, to utilize the "Ferry Dock," and to use the platted rights-of-way on the island, and that the rights passed to them when they acquired the properties. Count II alleges that an easement by implication allowing Plaintiffs to tie *Page 5 
into the deep well was created in favor of Lots 2, 17A, 173, 174, and 175. Count III alleges that a covenant by implication allowing Plaintiffs to tie into the deep well was created in favor of Lots 2, 17A, 173, 174, and 175. And finally, Count IV alleges that an implied easement to access Lots 2, 17A, 173, 174, and 175 grants Plaintiffs access over the platted rights-of-way and the "Ferry Dock." Additionally, in their summary judgment motion, Plaintiffs make several arguments which are not explicitly pleaded in their complaint. More specifically, Plaintiffs contend that Defendants are estopped from denying them access to the deep well and the "Ferry Dock." Plaintiffs further assert that they possess an implied easement to construct a personal dock along the shoreline of the island adjacent to Lots 2 and 17A. Defendants Hog Island, Inc., Peter Hess and Charlotte Justin, in their respective capacities as President and Secretary of South End Association, and Kim Roberts ("Defendants") have responded with a cross motion for summary judgment. A hearing was held with respect to these cross-motions for summary judgment on November 10, 2006.
 Standard of Review
"Summary judgment is a proceeding in which the proponent must demonstrate by affidavits, depositions, pleadings, and other documentary matter . . . that he or she is entitled to judgment as a matter of law and that there are no genuine issues of material fact." Palmisciano v.Burrillville Racing Assoc., 603 A.2d 317, 320 (R.I. 1992) (citingSteinberg v. State, 427 A.2d 338 (R.I. 1981); Ludwig v. Kowal,419 A.2d 297 (R.I. 1980)); Super. R. Civ. P. 56(c). "Summary judgment is appropriate if, viewing the evidence in the light most favorable to the nonmoving party, no material questions of fact exist and the moving party is entitled to judgment as a matter of law." Konar v. *Page 6 PFL Life Ins. Co., 840 A.2d 1115, 1117 (R.I. 2004). Furthermore, the party opposing the motion for summary judgment carries "the burden of proving by competent evidence the existence of a disputed issue of material fact and cannot rest upon mere allegations or denials in the pleadings, mere conclusions or mere legal opinions." Tanner v. TownCouncil of East Greenwich, 880 A.2d 784, 791 (R.I. 2005) (quotingLucier v. Impact Recreation, Ltd., 864 A.2d 635, 638 (R.I. 2005)). Only "[w]hen an examination of the pleadings, affidavits, admissions, answers to interrogatories and other similar matters, viewed in light most favorable to the party opposing the motion, reveals no such [disputed material issue of fact,] the suit is ripe for summary judgment."Industrial National Bank v. Peloso, 121 R.I. 305, 306, 397 A.2d 1312,1313 (1979).
 Analysis Count I
In Count I, Plaintiffs allege that an order from the case Thomas v.Hog Island, Inc., NC 69-0241, created express easements in favor of Lots 173, 174, and 175 which granted to their predecessors-in-interest the right to utilize the deep well, the "Ferry Dock," and the platted rights-of-way on the island. Plaintiffs further contend that the rights enumerated in the order passed to them when they acquired the properties.
In Thomas, the shareholder plaintiffs — three granddaughters of Mr. Knight — claimed the officers were mismanaging Hog Island, Inc.'s corporate affairs and sought to have the corporation placed into receivership. Apparently, the parties arrived at a compromise whereby each of the plaintiffs would receive one four acre parcel of property — Lots 173, 174, and 175, respectively — located in the southwesterly portion of *Page 7 
the island. This settlement was memorialized in an order entered by the trial justice on January 7, 1974, and which stated:
 "Each of the within Plaintiffs are [sic] to obtain a three hundred foot frontage of this total amount of frontage which shall include those rights to use the dock, artesian well established under the Walter Knight Trust and the roads that the above Plaintiffs shall have by reason of the conveyance of said three four-acre tracts of land but the deed shall not contain any specific reference to the aforesaid rights and the Respondent Corporation shall convey by Warranty Deed and will provide any pay for a survey to delineate and designate each four-acre tract of land. . . ."
See Pl.'s Ex. 15. Shortly after the terms of the settlement agreement were performed, the underlying litigation apparently was dismissed, and the trial justice ordered that "all outstanding orders and injunctions of the Court are vacated." See Def.'s Ex. J, Docket Entry #31.
In the instant matter, it is undisputed that none of the deeds in the chain of title for Lots 173, 174, and 175 contain any reference to the rights enumerated in the order.[5] Yet, as previously noted, Plaintiffs contend that the order created express easements in favor of the three lots to utilize the deep well, the "Ferry Dock," and the platted rights-of-way on the island. Plaintiffs further assert that those rights passed to them when they acquired the property. More specifically, they maintain that rights enumerated in the order were preserved and passed to them pursuant to both G.L. 1956 § 34-11-28[6]
and the language contained in the habendum clauses of each deed, which state that all rights, privileges, and appurtenances belonging to the grantor shall pass to the grantee. *Page 8 
Defendants counter that the court order is a nullity. More specifically, they contend that since the underlying litigation ended in dismissal rather in a judgment, the effect of the dismissal placed the parties in a legal position as if no suit had been brought in the first place. See Def.'s Mem. at 14 (citing Ochoa v. Union Camp Corp.,120 R.I. 898, 904, 391 A.2d 123, 127 (1978)). Thus, according to Defendants, "[w]hen a case is dismissed, all interlocutory orders in that action are vacated as a matter of law." Id. (citing Mendes v. Mendes, 111 R.I. 571,579-80, 305 A.2d 97, 102 (1973); White v. White, 70 R.I. 48, 56,36 A.2d 661, 665 (1944)). Additionally, Defendants argue that the doctrine of merger by deed bars Plaintiffs' reliance on the order because any rights referenced in the court order were merged into the deeds for Lots 173, 174, and 175. Therefore, since none of the deeds references the rights enumerated in the court order, Defendants claim that the doctrine prevents Plaintiffs from asserting rights based upon the order. Finally, Defendants contend that if the court order created any rights, those rights were personal rights, or licenses, not perpetual appurtenant rights as Plaintiffs claim. While this Court ultimately may have to determine what legal rights, if any, were created by the court order, the presence of disputed factual issues as to whether the order itself should even be considered by the Court precludes granting either party's summary judgment motion.
As noted, Defendants claim that the court order is a nullity because the underlying litigation was ultimately dismissed, thus vacating all interlocutory orders. However, without additional facts, it is impossible for the Court to determine the applicability ofOchoa to this case. In discussing the implications of dismissal or discontinuance of an action without prejudice, the Supreme Court held inOchoa that: *Page 9 
 "The effect of this type of dismissal is to put the plaintiff in a legal position as it [sic] he had never brought the first suit, and to render the proceedings a nullity and leave the parties as if the action had never been brought.
 A number of implications are raised by the fact that a dismissal without prejudice leaves the parties as if the action had never been brought. Primarily, such a dismissal allows the complaining party to refile his action without having the first judgment bar his claim by principles of res adjudicata. The complainant is thus not `prejudiced' because he can bring a new action without bearing any extra burdens as a result of his first action.
 By the same token, however, a dismissal (and we consider the `discontinuance' here to be, in effect, a dismissal) leaves the complaining party in no better position than if he had never filed the first action. He has the same burdens in bringing his claim as he would have had if it were his first suit. In particular, he must file his claim in a timely manner without regard to his previous claim, and if the second claim is subject to a statute of limitations, the claim must be filed within the time set by that statute or be barred by it, absent a statutory saving provision. In fact, in the absence of a statute to the contrary a party cannot even deduct from the period of the statute of limitations the time during which the action so dismissed was pending."
120 R.I. at 903-04, 391 A.2d at 126-27 (citations omitted).
Although the focus of the Ochoa Court's analysis pertained to the implications of dismissal without prejudice for purposes of res judicata and statutes of limitation, it clearly did not limit the number of implications to those two issues. Thus, if Ochoa applies, it is possible that the dismissal of the Thomas litigation rendered the proceedings a nullity and resulted in the disputed order being vacated. However, Defendants failed to specify whether the case was dismissed with or without prejudice. If the case, in fact, was dismissed with prejudice, it is unclear whether the principles set forth in Ochoa would apply to the facts to the present case. Moreover, Plaintiffs maintain that the order "constituted a settlement agreement" that was merely "placed on the record" and "agreed upon in writing." See Pl.'s Objection at 4. Yet, Plaintiffs have not presented any evidence to the Court which indicates this was, indeed, the intention *Page 10 
of the parties involved. In fact, the record is devoid of any evidence, beyond mere speculation, of what the litigants from Thomas understood the order to be and whether its terms were intended to survive dismissal of the case in the event that the settlement agreement was breached.
With respect to merger by deed, said doctrine provides: "once a warranty deed is accepted it becomes the final statement of the agreement between the parties and nullifies all provisions of the purchase-and-sale agreement." Lizotte v. Mitchell, 771 A.2d 884, 887
(R.I. 2001); see also Haronian v. Quattrocchi, 653 A.2d 729, 730 (R. I. 1995). As previously discussed, the three properties in dispute were exchanged as part of a settlement agreement, not a purchase-and-sale agreement. Defendants contend that the court order should be "characterized as a "purchase and sale agreement'" because "[i]t was a bilateral agreement for the transfer of real estate for stock." SeeDef.'s Mem. at 6. However, in order to reach this conclusion, the Court would be required to assess the intention of the parties involved in the underlying litigation, as well as the rights and legal issues involved, among other things. Clearly, there is insufficient information in the record before the Court to make any conclusive factual determinations pertaining to the merits of this legal argument. Thus, since factual issues exist as to whether the order should even be considered by this Court, the parties' cross motions for summary judgment on Count I are denied.
 Count II
Count II alleges that an easement by implication allowing Plaintiffs to tie into the deep well was created in favor of Lots 2, 17A, 173, 174, and 175. An easement by implication is "an easement not expressed by the parties in writing, but arising out of *Page 11 
the existence of certain facts implied in the transaction."See 25 Am. Jur.2d Easements § 19 (2004). Our Supreme Court has recognized that an implied easement may arise in the following circumstances: (1) from a "pre-existing condition," also known as a "quasi easement,"[7] see Wiesel v. Smira, 49 R.I. 246, 248-49,142 A. 148, 149 (1928); Catalano v. Woodward, 617 A.2d 1363, 1367 (R.I. 1992); (2) "by necessity," see Bovi v. Murray, 601 A.2d 960, 962 (R.I. 1992);Nunes v. Meadowbrook Dev. Co., Inc., 824 A.2d 421, 425 (R.I. 2003); or (3) "by reference to a map or plat"[8] see Kotuby v. *Page 12 Robbins, 721 A.2d 881, 883-84 (R.I. 1998). However, it is well-settled in this jurisdiction that the party claiming the benefit of an implied easement must demonstrate its existence by clear and convincing evidence. Mattos v. Seaton, 839 A.2d 553, 557 (R.I. 2004). *Page 13 
 A. Pre-Existing or Quasi Easement
A quasi easement, or easement by pre-existing use or condition, is an implied grant of an easement based on the presumed intent of the parties upon the severance of common ownership. Wiesel, 49 R.I. at 248-49,142 A. at 149. As one commentator has noted, this situation arises:
 "where a property owner has used one part of a single piece of property for the benefit of another part of the property, and then divides the property, the possessor of the previously benefited portion of the land may also possess an easement over the previously burdened part of the property."
See 7 Thompson on Real Property, The Law of Easements, § 60.03(b)(4) (1994). Stated differently, "[t]o create an easement by implication from a preexisting use imposed on one part of the property for the benefit of another part, there must be unity of title and a subsequent severance thereof." See 25 Am. Jur.2d Easements § 25 (2004). Additionally, "the property must have been openly used in a manner constituting a quasi-easement while it was in a single ownership." Id. When the property is divided, it is presumed that the common grantor intended that the quasi-easement continue as a true easement. Id. The presumption is based upon the theory that "the parties contracted with a view to the condition of the property as it actually was at the time of the transaction." Id. at § 24. Following these principles, our Supreme Court has held "upon the severance of an heritage, a grant will be implied of all those continuous and apparent easements which have in fact beenused by the owner during the unity, though they have no legal existence as easements." Catalano, 617 A.2d at 1367 (emphasis added).
In the instant matter, it is undisputed that Hog Island was under unity of title at the turn of last century. However, Plaintiffs have proffered no evidence which indicates *Page 14 
that actual and apparent access to the deep well was provided by way of an easement, or otherwise, to their properties while there was unity ownership, and that such access continued after the lots in question were originally severed and sold. Indeed, the record is devoid of evidence which demonstrates that any of their five lots wereever connected to the deep well, let alone continuously connected to the well. Thus, since Plaintiffs cannot sustain a claim of implied easement by pre-existing use, Defendants are entitled to summary judgment with respect to this issue. Cf. Catalano, 617 A.2d at 1367.
 B. Necessity
Plaintiffs next argue that they have an implied easement of necessity to connect Lots 2, 17A, 173, 174, and 175 to the deep well. Our Supreme Court has held:
 "[w]hether an easement exists by necessity is a question of fact. This Court has held, a trial justice sitting as a fact-finder is charged with the duty to draw inferences from established facts and that his or her conclusion will be accepted by this Court if the inference he [or she] drew was reasonable even though other equally reasonable inferences might have been drawn.
 This Court has ruled that the test of necessity is whether the easement is reasonably necessary for the convenient and comfortable enjoyment of the property as it existed when the severance was made. Moreover, this Court should consider whether a substitute could be procured without unreasonable trouble or expense."
Nunes v. Meadowbrook Dev. Co., 824 A.2d 421, 425 (R.I. 2003) (citations omitted) (emphasis added). Additionally, "the burden of proving that an alternative mode of access is not available is on the person claiming the easement by necessity." See 25 Am. Jur.2d Easements § 37 (2004).
 1. Lots 2 and 17A
Plaintiffs argue that access to the well is reasonably necessary for their comfortable use and enjoyment of the properties in question, especially with respect to *Page 15 
Lots 2 and 17A. More specifically, they point to deposition testimony from Daniel Fairchild, former president of Hog Island, Inc., who stated, "[t]here were two essential things on the Island. One was running water and the other was access to the ferryboat." Fairchild Dep. at 91. Additionally, they claim that "due to the size of Lots 17A and 2, a dwelling house cannot be built without access to the water supply."Pl.'s Mem. at 31. Thus, according to Plaintiffs, "there can be no serious dispute that the use of the Artesian Well is reasonably necessary for . . . [their] convenient and comfortable enjoyment of the properties . . . [because they] cannot even build on Lots 17A or 2 without water access." Id. Conversely, Defendants contend that Plaintiffs' easement by necessity theory fails because "water is not a `necessity' within the meaning of the doctrine." See Def.'s Mem. at 26. According to Defendants, "[n]ecessity corresponds to access[,] . . . where property is `landlocked'. . . ." Id. However, this argument is unpersuasive because "[i]t is a question of fact in each case whether the use constitutes the requisite necessity to the property conveyed."See 25 Am. Jur.2d Easements § 29 (2004).
Plaintiffs rely on the fact that they cannot dig a well on Lots 2 and 17A today because the lots are too small to contain both a septic system and a well. However, as indicated previously, the rule of law governing implied easements of necessity requires the court to determine whether the necessity existed at the time severance of ownership was made. As such, Plaintiffs have failed to demonstrate a lack of a general issue of material fact as to the issue of whether access to the deep well was, indeed, a necessity when Lots 2 and 17A were severed and sold to Plaintiffs' predecessors-in-interest in the 1930s. Specifically, it is unclear whether having running water provided from the deep *Page 16 
well would constitute a necessity in the 1930s. Indeed, the conflicting deposition testimony from Kim Roberts, past-president of Hog Island, Inc., demonstrates the existence of this factual issue. While he indicated that the deep well began servicing some houses in the southern part of the island in the early 1900s, he also stated many of the houses on the island did not have running water until the 1960s and that many homeowners brought hand-pumped water to their houses in bottles.See Roberts Dep. at 47-53.
Likewise, Plaintiffs have failed to address whether a substitute to having access to the deep well was unavailable or could not be procured without unreasonable trouble or expense when the lots were originally severed. For instance, it is unclear whether at the time the lots were severed, it would have been impracticable for the grantees to drill a well on the property or whether regulations in place at the time of the severance would have prevented them from doing so. However, if the regulations were not in effect when the lots were severed in the early 1930s, the law does not permit Plaintiffs to utilize the subsequently enacted regulations to establish an easement by necessity, and Plaintiffs' reliance on those regulations would be misplaced.
In sum, Plaintiffs have failed to establish conclusively that the alleged necessity existed at the time the two lots were severed and at that time no other reasonable alternative options were available. Without this material evidence,[9] Plaintiffs are not entitled to summary judgment with respect to the issue of whether an easement by *Page 17 
necessity exists. Moreover, the unique history of the island and the complexity of the factual issues involved with respect to these two lots preclude summary judgment with respect to Plaintiffs' contention that an easement by necessity exists. Clearly, the parties dispute whether the necessity existed at the time the lots were severed and whether there were any reasonable alternative options available to Plaintiffs' predecessors-in-interest. Accordingly, with respect to the issue of whether an implied easement by necessity was created in favor in Lots 2 and 17A, the parties' cross-motions for summary judgment are denied.
 2. Lots 173, 174 and 175
With respect to Lots 173, 174, and 175, the parties, again, dispute whether access to the well constituted a necessity when the three lots were severed in 1974. However, Defendants also note that Lot 173 currently contains a well that was drilled by Plaintiffs' predecessor-in-interest. Thus, according to Defendants, since Lot 173 already contains a well, and Lots 174 and 175 are large enough to hold a well and septic tank, an alternative mode of access, which was available, precludes this Court from finding an easement by necessity. While this evidence does seem to suggest that at the time the lots were severed a substitute — drilling a well on each lot — could be procured without unreasonable trouble or expense, summary judgment is improper at this juncture in the proceedings. More specifically, Plaintiffs have not addressed the issue of whether any reasonable alternative options were available at the time Lots 173, 174, and 175 were severed. Clearly, an alternative existed; however, the reasonableness of it, and other potential alternatives, have not been conclusively established by either *Page 18 
party. Thus, both parties' motions for summary judgment with respect to the issue of whether an easement by necessity exists in favor of Lots 173, 174 and 175 are denied.
 C. Conveyance of Property with Reference to a Map orPlat
With respect to finding an easement by implication derived from the dedication of roadways or rights-of-way on a plat, our Supreme Court has held:
 "We are reminded of the well-recognized rule which holds that a sale of a platted lot with reference to the plat will, as between the grantor and the grantee, give the latter a right to use all of the streets delineated on the plat even though the plat is unrecorded. Such an easement is appurtenant to the property and passes with the conveyance of the property, unless specifically excluded, even though not mentioned in the deed."
Kotuby, 721 A.2d at 884 (quoting Robidoux v. Pelletier, 391 A.2d 1150,1156 (1978)); see also Bitting v. Gray, 897 A.2d 25, 32-33 (R.I. 2006).
In the instant case, it is undisputed that the deeds to the five lots owned by Plaintiffs refer to subdivision plans of Hog Island. More specifically, the deeds to Lots 2 and 17A reference the 1923 "Waterman Plan," and the deeds to Lots 173, 174, and 175 reference the 1974 "Waterman Survey." Though it is unclear whether this rule applies to anything other than rights-of-way, roadways or streets shown on the plat, neither party suggests that either the 1923 plat or 1974 plat depicts the deep well in dispute. Thus, even assuming, arguendo, that this rule of law applies to the deep well, there is simply no evidence to demonstrate that the reference to either of the plats included the use of a well that was not even depicted on the documents. As such, this rule does not support Plaintiffs' argument, and Defendants are entitled to summary judgment with respect to this issue. *Page 19 
 Count III
Count III alleges that a covenant by implication allowing Plaintiffs to tie into the well was created in favor of Lots 2, 17A, 173, 174, and 175. However, Plaintiffs have provided the Court with no authority as to the basis and source of this legal theory. The only reference to "implied covenants" made by our Supreme Court was in relation to the issue of establishing an easement by implication by way of conveyance of property with reference to a map or plat. In that context, the Court has held "the existence of the streets as platted operates by way of implied covenant, implied grant, estoppel, or dedication, whichever way of operation may be the truer, to secure to the grantee a right of way over such platted streets." Bitting, 897 A.2d at 33 (citing Chapin v.Brown, 15 R.I. 579, 583-84, 10 A. 639, 640-41 (1887)); see also NewportRealty, Inc. v. Lynch, 878 A.2d 1021, 1036 (R.I. 2005);Kotuby, 721 A.2d at 884 ("The purchaser of land bounded upon a street designated as such . . . on a map made by the owner of the lands in reference to which the sale was made has a private right appurtenant to his lot, which he holds by an implied covenant. . . .") (quoting 2 Thompson, Commentaries on the Modern Law of Real Property, § 361 (1980 Replacement Ed.)).
American Jurisprudence addresses implied covenants in a similar fashion. More specifically, it states, "[w]here property is sold in reference to a map or plat which shows that the property abuts upon a public highway, the map or plat may amount to an implied covenant by the vendor that the highway is what it purports to be." See 25 Am. Jur.2dCovenants § 36 (2004). As previously discussed, it is unclear whether this rule applies in any situation other than with the use of streets or rights-of-way depicted on a *Page 20 
plat, but it is undisputed that neither of the plats referenced in this case depicts the deep well in question. Thus, this legal doctrine is inapplicable to the facts of the case, and Defendants are entitled to summary judgment on this count.
 Count IV
Count IV alleges that Plaintiffs have implied easements to access Lots 2, 17A, 173, 174, and 175, as well as an implied easement by necessity to utilize the "Ferry Dock."
 A. Use of the Rights-of-Way
Plaintiffs claim that they have implied easements to access the five lots owned by them. With respect to Lots 173, 174, and 175, the deeds for those respective lots reference a right-of-way over Harbor View Avenue. See Pl.'s Ex. 17A, 17B 17C. Based on the express language contained in the deeds, which neither party disputes, Plaintiffs clearly have an express easement over Harbor View Avenue. Thus, this Court re-affirms Plaintiffs right to utilize the easement expressly granted in favor of Lots 173, 174, and 175. The deeds presented to the Court for Lots 2 and 17A, however, do not contain any specific language regarding the use of a right-of-way. See id. at 17D 17E.
It is undisputed that the deeds to all five lots reference subdivision plats which depict several rights-of-way. Moreover, Defendants do not contend that the easements depicted on the plat have been specifically excluded in any of the deeds to Plaintiffs' five lots. As previously discussed, our Supreme Court has held with respect to conveyances made with reference to a plat that:
 "Disputes surrounding easements over roads depicted on recorded plats, should rise or fall by reference to the plat on which the disputed parcel is depicted. When a property owner subdivides land and sells lots with reference to a plat, he [or she] grants easements to the purchasers in the roadways shown on the plat, *Page 21 
with or without later dedication of the roadways to the public. In the absence of dedication to the public, the easement depicted on the plat is appurtenant to the property and passes with the conveyance of the property, unless specifically excluded, even though not mentioned in the deed."
Bitting, 897 A.2d at 32 (citations omitted). Thus, following this longstanding rule, Plaintiffs, as a matter of law, have established implied easements to access all five lots by way of the roadways and rights-of-way depicted on the plats referenced in the deeds, and are entitled to summary judgment with respect to this issue.[10]
 B. "Ferry Dock"
Plaintiffs contend that an implied easement by necessity to utilize the "Ferry Dock" was created in favor of all five lots. Plaintiffs argue that the "Ferry Dock" provides access to South Riverside Drive, the main road that runs north-to-south on the easterly side of Hog Island and provides entry to the platted rights-of-way that run from east-to-west on the southerly tip of the island. See Pl.'s Ex. 6 7. They also claim that the "Ferry Dock" served as the primary docking station for the passenger ferry to the island until 2002. Indeed, Kim Roberts, past-president of Hog Island, Inc., testified during a deposition that "[e]veryone uses the dock . . . [,] [i]t was the main source of access to the island." See Roberts Dep. at 108. Plaintiffs also point to advertisements from the early part of the twentieth century regarding the sale of lots within the subdivision which indicate that the ferry was a method to reach the island and that the "Ferry Dock" was dedicated for "community use." See Pl.'s Ex. 20A. However, while it is undisputed that none of the deeds to the five lots in question references access to the "Ferry Dock," this Court finds that genuine issues of material fact exist as to *Page 22 
whether an implied easement by necessity to utilize the "Ferry Dock" was created in favor of all five lots.
As previously discussed, with respect to an implied easement by necessity, "[i]t is a question of fact in each case whether the use constitutes the requisite necessity to the property conveyed."See 25 Am. Jur.2d Easements § 29 (2004). Thus, a factual issue exists as to whether use of the "Ferry Dock" amounts to a necessity. Additionally, Plaintiffs have not foreclosed the existence of another reasonable or practicable mode of ingress and egress. See 28A C.J.S.Easements § 97 (1996). As previously noted, this Court is compelled to consider whether a substitute mode of egress and ingress could be procured without unreasonable trouble. See Nunes, 824 A.2d at 425. Defendants suggest that Simoni has been accessing his lots for years by tying his boat to a post or mooring on the southwest side of the island.See Def.'s Mem. at 28. Since Plaintiffs have failed to establish that they are not seeking access via the "Ferry Dock" merely to avoid inconvenience and delay, summary judgment must be denied. Thus, both parties' motions for summary judgment with respect to the issue of whether an easement by necessity exists to utilize the "Ferry Dock" are denied.
 V. Remaining Arguments
Plaintiffs also make several arguments which are neither specifically related to the four counts on which they have moved for summary judgment nor included in their complaint. More specifically, Plaintiffs contend that Defendants are estopped from denying them access to the deep well and the "Ferry Dock." Plaintiffs further assert that they possess an implied easement to construct a personal dock along the shoreline of the island. *Page 23 
 A. Estoppel
Plaintiffs contend that Defendants are estopped from denying them access to the deep well and "Ferry Dock." An easement by estoppel may exist:
 "[i]f a person has exercised a right that looks like an easement, relying reasonably on an oral or other promise . . ., and has reasonably changed position based on that reliance, a court may find that person to possess an easement, despite the failure to satisfy the ordinary requirements to establish an express easement."
See 7 Thompson on Real Property, The Law of Easements, § 60.03(b)(3) (1994). For example, an easement may be created by estoppel where "a vendor represents to a purchaser that an easement exists, in favor of the premises proposed to be sold, over the vendor's other realty, and the purchaser relies on that representation, but the conveyance subsequently made does not mention such an easement." See 25 Am. Jur.2dEasements § 14 (2004).
Clearly, finding the existence of an easement by virtue of estoppel requires a fact-intensive analysis. Plaintiffs baldly assert that "Defendants transferred deeds to Plaintiffs' predecessors which confirmed the existence of the access [to the] rights of way . . ." and, "[t]hereafter, . . . [they] acted in reliance. . . ." See Pl.'sMem. at 17. However, Plaintiffs have neither specifically identified any representation(s) or equivalent conduct which would support the existence of an easement granting them access to the deep well and "Ferry Dock," nor identified how they relied to their detriment on the alleged communication or representation. Thus, Plaintiffs have not carried their burden as to whether easements by estoppel exist, and summary judgment must be denied. *Page 24 
 B. Implied Easement To Construct a Personal Dock Adjacent toLots 2 and 17A
Plaintiffs claim that Defendants "had an open policy and common plan and scheme whereby owners of lots on Riverside Drive and South Riverside Drive were routinely allowed to construct personal docks on Hog Island Property shoreline. . . ." See Pl.'s Mem. at 23. Thus, according to Plaintiffs, because "the ability to build a dock adjacent to lots on South Riverside Drive was reasonably necessary to the beneficial use and enjoyment of the lots at the time of the original conveyances . . . purchasers of lots on South Riverside Drive would be allowed to build a personal dock. . . ." Id. at 24. Defendants counter that the construction of a dock would amount to an "improvement to the land, and the right to construct improvements is an incident of ownership."See Def.'s Mem. at 23. Moreover, Defendants assert that easement holders do not have that same right. Id. Thus, it claims that while Plaintiffs have an easement which permits them to cross over Defendants' "submerged, riparian lands,"[11] they have no right to build on Defendants' property. Id. However, given that the resolution of this issue may require an analysis of the littoral rights and the public trust doctrines — areas of law neither party has addressed in memoranda — summary judgment is inappropriate.
It is well-settled in Rhode Island that pursuant to the public trust doctrine, the state maintains title in fee to all soil within its boundaries that lies below the high-water mark, and it holds such land in trust for the use of the public. State v. Ibbison, 448 A.2d 728, 730,732-33 (R.I. 1982); Nugent v. Vallone, 91 R.I. 145, 152, 161 A.2d 802,805 (1960). In Carr v. Carpenter, 22 R.I. 528, 529, 48 A. 805 (1901), our Supreme Court *Page 25 
established that the owners of lands adjoining navigable waters have the right to "enjoy what remains of the rights and privileges in the soil beyond their strict boundary lines, after giving to the public the full enjoyment of their rights." Defendant Hog Island, Inc., therefore, as owner of the land adjoining the waters, does not automatically lose all rights to the submerged soil and subsequently filled area. See Hall v.Nascimento, 594 A.2d 874, 877 (R.I. 1991).
In the instant case, the record before the Court is devoid of information evidencing where the dock Plaintiffs seek to construct would be located in relation to the high-water mark boundary line. Thus, it is impossible to determine if Plaintiffs want to construct a personal dock on Hog Island, Inc.'s property or property held by the state in public trust. Additionally, in light of the principles previously discussed, Hog Island, Inc., may possess littoral rights to the submerged land where Plaintiffs would like to construct their dock. This might explain Plaintiffs' contention that Hog Island, Inc. had a policy of permitting lot owners to construct personal docks on its shoreline. However, regardless of past practices on the island, as noted in Hall v.Nascimento, even though Defendants could possess littoral rights over the submerged areas, they may not exercise those rights in a manner that is inconsistent with the public trust because their rights are subservient to the state's rights. 594 A.2d at 877. Indeed, in their memorandum, Defendants allude to the existence of state Coastal Resources Management Council regulations which prevent Plaintiffs from constructing a dock. See Def.'s Mem. at 30. However, neither party has presented any regulations to this Court. Thus, because of the many unresolved issues related to this claim, the parties' cross motions for summary judgment with respect to this issue are denied. *Page 26 
 Conclusion
In conclusion, the complexity of the legal issues presented in this motion, especially in the context of Hog Island's unique history and development, preclude summary judgment on many issues. Specifically, the parties' cross motions for summary judgment on Count I are denied. With respect to Count II, Plaintiffs' motion is denied, and Defendants' motion is granted with respect to the issues of whether an implied easement to access the deep well was created by way of a quasi-easement or by reference to a plat. Thus, the only issue remaining from Count II is whether an implied easement by necessity was created in favor in Lots 2, 17A, 173, 174, and 175.
Plaintiffs' motion for summary judgment on Count III is denied, and Defendant's cross motion is granted. As for Count IV, Plaintiffs' motion for summary judgment is granted with respect to the existence of implied easements to access the roadways and rights-of-way depicted on the plats referenced in the deeds for Lots 2, 17A, 173, 174, and 175, but is denied as to whether an easement by necessity exists to utilize the "Ferry Dock." Conversely, Defendants motion for summary judgment on Count IV of Plaintiffs' complaint is denied. Finally, both parties' motions for summary judgment are denied with respect to whether easements by estoppel to access the deep well and the "Ferry Dock" exist, and whether Plaintiffs benefit from an implied easement to construct a personal dock along the shoreline of the island.
[1] There is some dispute among the parties as to whether the well in question is an Artesian Well. See Def.'s Mem. at p. 3 n. 4; see also Pl.'sObjection at 4 n. 1. For purposes of this decision, the Court will refer to the well as the "deep well."
[2] More specifically, the six rights-of-way depicted on the plat are South Riverside Drive, Sunset Drive, Mount Hope Avenue, Harbor View Avenue, Chesawanoc Avenue, and Bay View Avenue.
[3] The rights-of-way depicted on the 1974 "Waterman Survey" are South Riverside Drive, Graystone Avenue, Mount Hope Avenue, Harbor View Avenue, Chesawanoc Avenue, Bay View Avenue, Sunset Drive, and a twenty-five foot right-of-way which extends Harbor View Avenue to the westerly side of the island where Lots 173, 174, and 175 are located.
[4] Specifically, Simoni claims that he sought to tie Lots 17A and 174 into the "SEA water system," but that the SEA members and Hog Island, Inc. conspired to deny him access.
[5] However, as previously mentioned, the deeds in the chain of title for Lots 173, 174, and 175 all reference a twenty-five foot right-of-way over Harbor View Avenue. See Pl.'s Ex. 17A, 17B 17C. Neither one disputes that Plaintiffs have the right to use the right-of-way.
[6] In its entirety, § 34-11-28, entitled "Rights, privileges, and appurtenances included in grant," states, "[i]n any conveyance of real estate all rights, privileges, and appurtenances belonging or appertaining to the granted estate shall be included in the conveyance, unless a different intention shall clearly appear in the deed, and it shall be unnecessary to enumerate or mention them either generally or specifically."
[7] The term "quasi easement" is synonymous with the term "easement by implication from prior use." See 7 Thompson on Real Property, The Law ofEasements, § 60.03(b)(4) (1994); see also 25 Am. Jur.2dEasements § 22 (2004).
[8] Plaintiffs encourage this Court to follow a more nebulous standard. According to Plaintiffs, "an implied easement is predicated upon the theory that when a person conveys property, he or she includes or intends to include whatever is necessary for the use and enjoyment of the land conveyed," see Pl.'s Mem. at 19 (quoting Bovi v. Murray,601 A.2d 960, 962 (R.I. 1992)), and that when determining whether an implied easement exists, the court should look to the "intent of the parties at the time of the conveyance in order to determine whether an implied easement existed where no written easement was created." Id. 18-19 (citing Catalano v. Woodward, 617 A.2d 1363, 1367 (R.I. 1992)). Thus, it appears under Plaintiffs analysis that an implied easement can represent anything the grantor must have intended to pass to the grantee that is necessary for the use and enjoyment of the land conveyed. However, the Court finds no basis for this standard in the cases cited by Plaintiffs, or under any other case law from this jurisdiction.
In Bovi, the Court was specifically discussing the doctrine of implied easement by necessity and, more specifically, whether unity of ownership was required to establish such an easement. Indeed, in its entirety, the paragraph cited by Plaintiffs states:
 "An implied easement is predicated upon the theory that when a person conveys property, he or she includes or intends to include in the conveyance whatever is necessary for the use and the enjoyment of the land retained. If there is no unity of ownership, there can be no implied easement. Indeed the unity requirement prevents a finding of an easement by necessity in the land of a third person who is a stranger to the claimant's title."
Bovi, 601 A.2d at 962 (citations omitted). Clearly, the Court's discussion of the limited issue of unity of ownership does not represent an entire analysis of what is required to establish an easement of necessity. See Nunes v. Meadowbrook Dev. Co., Inc., 824 A.2d 421, 425
(R.I. 2003).
Additionally, Plaintiffs' reliance on Catalano is equally unpersuasive. In their memorandum Plaintiffs state:
 "In finding an implied easement the Court [in Catalano] noted:
 `It has long been the policy of this court to ascertain the intent of the parties when construing written instruments. Although the deed in this case was inartfully drawn, we can infer the intent if the parties. . . .'"
See Pl.'s Mem. at 19 (quoting Catalano, 617 A.2d at 1367). However, the paragraph quoted by Plaintiffs pertains to the Court's analysis in interpreting language from a deed purporting to reserve for the plaintiff's estate an easement over the defendant's parcel, not an analysis of whether an implied easement existed. Indeed, the Court's discussion of quasi easements did not begin until two paragraphs after the quoted language cited by Plaintiffs, where it stated:
 "[Plaintiff] Catalano would also be able to sustain his claim of an implied easement across parcel three. We have previously held that; upon the severance of an heritage, a grant will be implied of all those continuous and apparent easements which have in fact been used by the owner during the unity, though they have no legal existence as easements."
Catalano, 617 A.2d at 1367. Thus, since the language inCatalano cited by Plaintiffs clearly did not relate to the Court's analysis of whether an implied easement existed, their reliance on this case is also misplaced.
Finally, Plaintiffs cite Reagan v. Brissey, 844 N.E.2d 672 (Mass. 2006), to support their position. See Pl.'s Mem. at 19. InReagan, the Supreme Judicial Court had to determine whether unnumbered parks depicted in a subdivision plan referenced in the plaintiffs' deeds were subject to implied easements in favor of land owners within the subdivision. The Court noted that "[a] plan referred to in a deed becomes a part of the contract so far as may be necessary to aid the identification of the lots and to determine the rights intended to be conveyed" and that "where land is conveyed with reference to a plan, an easement . . . is created only if clearly so intended by the parties to the deed." See Reagan, 844 N.E.2d at 677. Examining the "deeds, the plan, and the circumstances attendant to, and following, the establishment of the . . . subdivision[,]" such as the method of exhibition of the parks on the plan, the placement of the parks throughout the subdivision, and advertisements from the 1870s which "suggested the existence of parks for the enjoyment of all lot-owners," the Court concluded "the plaintiffs satisfied their burden of proving that an implied easement was intended with respect to the parks."Id. at 677-78. Specifically, the Court held that the plan referenced in the plaintiffs' deeds raised an "inference" that the grantor intended to grant rights in the parks to his grantees. Id. at 677. The Court then examined the circumstantial evidence to confirm that an implied easement was intended with respect to the parks. Id. at 677-78.
Clearly, the Court's conclusion that implied easements existed with respect to use of the parks was premised upon the doctrine on implied easement by reference to a map or plat. However, it is unclear from Plaintiffs' memorandum whether the law in Massachusetts is consistent with our Supreme Court's interpretation of this legal doctrine. Furthermore, even if this Court were to follow Reagan, the standard enunciated in that case would not support Plaintiffs' contention that implied easements to access the deep well and construct a personal dock were created in favor of their lots. The Reagan Court's analysis is founded on the fact that the plaintiffs' deeds all made reference to the plan which depicted the parks in dispute. As previously noted, the references to the plan are what raised the "inference" that the grantor intended to grant rights in the parks to his grantees. Yet, in the instant case, Plaintiffs cannot even raise the "inference," as required under Reagan. More particularly, while it is undisputed that the deeds to all five of Plaintiffs' lots reference subdivision plats, it is also undisputed that none of the plats depict the deep well or any personal docks on Hog Island's shoreline property. Additionally, nowhere inReagan did the Court hold that circumstantial evidence, alone, was sufficient to establish an implied easement. Therefore, Plaintiffs reliance on this case is ultimately unpersuasive.
[9] Plaintiffs cite many factual circumstances in their memorandum — that many newly constructed homes on the island have been allowed to connect to the well, the fact that they are the only property owners on the island to have ever been denied access to the well, among others — to support the establishment of an easement by implication. See Pl.'sMem. at 25. However, these facts are not relevant to any legal theory for establishing an implied easement, as none of the evidence proffered speaks to the circumstances which existed at the time the lots in question were severed and sold. Indeed, the majority of the evidence concerns factors that have occurred well after the lots were originally severed, as well as after Plaintiffs had acquired the five lots in question.
[10] This holding also renders moot Plaintiffs' contention that an implied easement by necessity to utilize the roadways and rights-of-way depicted on the plats was created in favor of Lots 2, 17A, 173, 174, and 175.
[11] Defendants repeatedly utilize the phrase "submerged riparian rights" in their memorandum. However, the term "riparian" relates to land "located on the bank of a river or stream." See Black's LawDictionary 1352 (8th ed. 2004); see also 93 C.J.S. Waters § 11 (2001). Under the facts of this case, the term "littoral" would be appropriate. Littoral is defined as "relating to the coast or shore of an ocean, sea, or lake." See Black's Law Dictionary at 952; see also State v.Ibbison, 448 A.2d 728, 729 n. 1 (R.I. 1982). *Page 1